ENVIRONMENTAL PROCEDURES, INC. and Advanced Wirecloth, Inc., Appellants,

v.

George E. GUIDRY, Dwight W. Andrus, III, Dwight W. Andrus Insurance, Inc., and Lexington Insurance Co., Appellees.

No. 14–05–01090–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 3, 2009.

Alene R. Levy, Christina Fontenot Crozier, Houston, David L. Ylitalo, Werner Powers, Erika Lea Blomquist, Dallas, for appellants.

Chester Joseph Makowski, Deborah Beck Alsup, Rick Lee Oldenettel, Houston, John E. McElligott, Lafayette, for appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## MAJORITY OPINION
## ON REHEARING

EVA M. GUZMAN, Justice.

We grant appellants' motion for rehearing, deny as moot their motion for rehearing en banc, withdraw our opinions of

April 17, 2008, and substitute this majority opinion on rehearing.

This multi-issue appeal arises from a dispute between an insurance broker and his clients as a result of the marketing and sale of several insurance policies. Appellants Environmental Procedures, Inc. and Advanced Wirecloth, Inc. (the "Insureds") contend the trial court erred in (a) granting partial summary judgment in favor of the insurance broker, the company that employed him, and the owner of that company on the Insureds' claims arising from the appellees' alleged negligence, negligent misrepresentation, and violations of former article 21.21 of the Texas Insurance Code;[1] (b) directing a verdict on the Insureds' claims for breach of fiduciary duty; (c) failing to render judgment in the Insured's favor regarding their claims under section 101.201 of the Texas Insurance Code; (d) excluding from evidence two issues of a trade publication; and (e) enjoining the Insureds and their counsel from further use or disclosure of certain documents obtained through discovery in another case. We conclude that the trial court erred in granting partial summary judgment; thus, we reverse the trial court's judgment in part and remand the Insureds' claims of negligence and violations of article 21.21 of the Texas Insurance Code. Additionally, we conclude that the trial court's non-disclosure order was void *ab initio,* and thus, we dismiss as moot the Insureds' appeal from this order. In all other respects, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Environmental Procedures, Inc. d/b/a Sweco Oilfield Services ("EPI")

operated as a tool rental and oilfield service company; its subsidiary, appellant Advanced Wirecloth, Inc. ("Wirecloth"), manufactured screens used in the oil industry. At the time of the events in question, the respective headquarters for EPI and Wirecloth (collectively, "the Insureds") were located in Texas. The Insureds' agent or broker was appellee George Guidry ("Guidry"), who was employed by appellee Dwight W. Andrus Insurance, Inc. (the "Agency") in Louisiana. Appellee Dwight W. Andrus, III ("Andrus") was the owner of the Agency. Guidry presented insurance proposals and presentations to the Insureds in Texas and delivered the relevant policies or cover notes there. Although Guidry sold surplus-lines coverage to the Insureds, he was not licensed to do so in Texas.

### A. The Insurance Policies

In 1991, Guidry obtained insurance, effective October 1, 1991 through September 30, 1992, for the Insureds through British-American Insurance Group Ltd. ("British American"). The coverage consisted of a commercial general liability ("CGL") policy with a limit of $1 million for any one accident or occurrence and an umbrella policy with a $3.5 million limit for any one accident or occurrence. Coverage under the 1991 British American CGL policy was apportioned among seven insurers, and the responsibility for the coverage limits under the umbrella policy was shared among twenty-eight insurers. Guidry provided the Insureds with cover notes reflecting this coverage.

In November 1992, Guidry renewed the coverage on the British American CGL policy. He provided the Insureds with a

---

1. *See* Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548, 548–51, *repealed and recodified by* Act of May 22, 2003, 78th Leg., R.S., ch. 1674 §§ 2, 26, 2003 Tex. Gen. Laws 3611, 2659–61 (current versions at TEX. INS. CODE ANN. §§ 541.051, 541.056 (Vernon 2007)).

cover note showing that this coverage was divided among three insurers. A few weeks later, British American sent cover notes to the Agency showing excess CGL coverage for the Insureds apportioned among eleven insurers and $5 million in umbrella coverage provided by Ocean Marine Indemnity Company Limited. These policies were effective from October 1, 1992 through September 30, 1993.

In 1993 and 1994, Guidry obtained the Insureds' CGL and umbrella insurance from Lexington Insurance Company. Under the terms of the Lexington policies, the limits of coverage were reduced by the costs of defense.

## B. The Underlying Litigation

In the summer of 1994, Wirecloth notified Guidry that it had been sued by a competitor, Derrick Manufacturing Corporation, who alleged various patent and trademark violations, as well as other violations of Texas common law and the Texas Business and Commerce Code. Guidry forwarded this information to British American. In the summer of 1995, the Insureds, among others, again were sued by this competitor for similar alleged violations of a second patent. These lawsuits (the *"Derrick* litigation") were subsequently consolidated. The Insureds notified Guidry of the second suit, and Guidry forwarded the information to Lexington. Although Lexington appointed defense counsel under a reservation of rights in April 1996, the Insureds continued to pay most of their own defense costs.

In September 2001, Varco, L.P., a subsidiary of National Oilwell Varco, a successor in interest to the Insureds,[2] paid approximately $15 million to settle the

*Derrick* litigation. By this time, the Insureds had incurred approximately $17 million in attorneys' fees. Lexington paid a fraction of the Insureds' defense costs, but did not contribute funds to settle the *Derrick* litigation.

Within a week of the settlement, Lexington filed a declaratory judgment action against the Insureds seeking a coverage determination (the "Coverage Suit"). Additional insurers were later added to the suit. The Insureds reached a number of settlement agreements with British American and several other insurers. Regarding the coverage procured through British American, there were no settlements with the insurers securing the 1991–1992 CGL and umbrella policies, but the Insureds settled with all of the insurers providing coverage under the 1992–1993 CGL and umbrella policies. Between these two extremes, the Insureds reached settlement agreements with some, but not all, of the insurers securing the 1992–1993 excess CGL policy. The Insureds settled their claims against Lexington in the Coverage Suit at the same time as they settled claims asserted against Lexington in this suit.

## C. This Suit

The Insureds filed the instant suit against Guidry, the Agency, and Andrus (collectively, the "Brokers") on August 29, 2003 (the "Filing Date"), asserting claims against the Brokers for negligence, gross negligence, negligent misrepresentation, fraud, breach of fiduciary duty, and violations of article 21.21 of the Texas Insurance Code. The Insureds also asserted claims under section 101.201 of the Texas Insurance Code (hereinafter "Unautho-

---

**2.** In 1995, Drexel Holdings bought EPI and Wirecloth, and in April 1996, Tuboscope bought Drexel. National Oilwell Varco later acquired Tuboscope. The record concerning the identities of the Insureds' successors in interest is less than clear, and we refer to the Insureds and any such successors by the Insureds' names, as the parties have done.

rized Insurance" claims), alleging that British American was an "unauthorized insurer," that the Brokers assisted in the procurement of the British American policies, and that the Brokers therefore were liable for the unpaid amount of the claims covered under the terms of the British American policies. In addition, the Insureds alleged that Andrus negligently supervised Guidry, that Andrus operated the Agency as a sham to perpetrate a fraud, and that the Agency was Andrus's alter ego. Finally, the Insureds invoked the discovery rule and the doctrine of estoppel, alleging that they first learned of the misconduct when Guidry's deposition was taken in the Coverage Suit.

### 1. Partial Summary Judgment

The Brokers filed a motion for partial summary judgment based on a limitations defense. In their motion, the Brokers asserted that the Insureds' claims for negligence, negligent supervision, negligent misrepresentation, and violations of article 21.21 of the Texas Insurance Code were barred by the two-year statute of limitations. In support of the motion, the Brokers attached a letter dated May 12, 1999 from Lexington's attorney to the Insureds' attorney, in which Lexington's attorney stated, "Under the terms of the Lexington primary policies, the defense costs reduce the applicable limits of insurance." The Brokers also relied on a letter from Lexington dated December 10, 2000, in which Lexington's counsel asserted that the two-year limitations period applied to the Insureds' claims of negligence, negligent supervision, negligent misrepresentation, and violations of article 21.21 of the Texas Insurance Code. The Insureds responded and filed special exceptions on December 8, 2004.

The motion for partial summary judgment was submitted without oral argument on February 7, 2005. Less than two weeks before the submission date, the Brokers filed a reply accompanied by additional evidence, and less than a week later, the Insureds filed a surreply, objections, and a motion to strike the Brokers' summary-judgment motion on the grounds that it was set for submission after the summary-judgment hearing deadline specified in the trial court's docket control order. During a telephone conference on February 9, 2005, the trial court denied the Insureds' motion to strike, and on March 18, 2005, the trial court granted the Brokers' motion for partial summary judgment.

### 2. Non–Disclosure Order

A few days before the trial court granted partial summary judgment, Lexington filed a "Motion to Enforce Confidentiality Agreement and for Entry of Protective Order." No evidentiary hearing was held, and the trial court signed an order granting the motion on April 5, 2005 (hereinafter the "Non–Disclosure Order"). This order barred the Insureds, their attorneys, and additional non-parties from using or disclosing, in this case or in any other proceeding, certain depositions and personnel files obtained in the Coverage Suit.

### 3. Trial and Judgment

About a month after entry of the Non–Disclosure Order, the case was tried to a jury. As a defense to the Unauthorized Insurance Claims, the Brokers asserted that the insurance in question had been independently procured. Before the case was submitted to the jury, the trial court granted the Brokers' motion for directed verdict as to the Insureds' breach-of-fiduciary-duty claims.

The jury returned a verdict in favor of the Brokers as to the Insureds' claims of fraud by misrepresentation and fraud by nondisclosure. The jury also found that the 1991 and 1992 British American cover notes were independently procured, and

pursuant to the instructions in the jury charge, answered no further questions regarding the Insureds' Unauthorized Insurance Claims. The trial court rendered judgment on the verdict and denied the Insureds' motions for judgment notwithstanding the verdict and for new trial.

## II. ISSUES PRESENTED

The Insureds present the following six compound issues for review.

- First, they challenge the partial summary judgment on the grounds that (a) the motion did not address the 1991 and 1992 placements, (b) limitations on the 1993 and 1994 placements did not begin to run more than two years before suit was filed, and (c) the motion was not supported by evidence that the Insureds knew or should have known about the Brokers' violations of article 21.21 of the Insurance Code more than two years before they filed suit.

- Second, the Insureds argue that they raised fact issues regarding the existence of a formal or an informal fiduciary relationship with the Brokers, and thus, the trial court erred in granting the Brokers a directed verdict on the Insureds' claims for breach of fiduciary duty. In a subsidiary argument, the Insureds contend that there is a presumption that their injury was inherently undiscoverable because a fiduciary relationship exists; therefore, the statute of limitations was tolled.

- Third, the Insureds assert that the trial court erred in failing to grant their motion for judgment notwithstanding the verdict concerning their

claims under the Unauthorized Insurance Act because the evidence conclusively established that the only exception to liability invoked by the Brokers did not apply.

- Fourth, the Insureds argue that the trial court committed harmful error in sustaining the Brokers' hearsay objections to the Insureds' offer of two issues of *Surplus Lines Reporter & Insurance News* as evidence.

- Fifth, the Insureds assert that the jury's award of attorneys' fees must be reversed and the claim remanded.

- Sixth, the Insureds complain about the Non–Disclosure Order, in which the trial court granted Lexington's motion to enforce a confidentiality agreement that had been reached in the Coverage Suit.[3] The Insureds argue that the Non–Disclosure Order is an injunction that expired upon entry of final judgment, or alternatively, the order is void due to procedural defects. In addition, Lexington moved to dismiss the appeal of this issue and to designate certain items in the record for *in camera* review. Both motions were carried with the case.

## III. ANALYSIS

### A. Brokers' Motion for Partial Summary Judgment

#### 1. Standard of Review

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish the movant's right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D.*

---

**3.** Lexington moved to enforce the agreement after the Insureds' attorneys filed an amicus brief in *Lexington Insurance Co. v. Strayhorn,* 209 S.W.3d 83 (Tex.2006). According to Lex-

ington, exhibits to the amicus brief contain material that is subject to the confidentiality agreement.

*Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007).

### 2. Challenged Claims

At the time the Brokers moved for partial summary judgment, the Insureds' live pleading included claims of negligence based on certain conduct by Guidry.[4] The Insureds asserted claims of negligent supervision and gross negligence against Andrus and the Agency for the same conduct. In addition, the Insureds claimed that the Brokers negligently and falsely represented that they were obtaining the best possible insurance at the lowest possible price; falsely represented terms and conditions of the insurance they procured; and failed to disclose material terms of the insurance coverage. The foregoing claims were asserted under both the common law and article 21.21 of the Texas Insurance Code.[5] In particular, the Insureds alleged that the Brokers violated subsections (2),[6] (5),[7] and (11)[8] of section 4 of former article 21.21 of the Texas Insurance Code. All of these

4. These claims were based on the allegations that Guidry: (a) failed to promptly notify insurers of the *Derrick* litigation; (b) placed coverage with financially unsound insurers and insurers with unsound management; (c) placed coverage with insurers that were nonexistent, corrupt, or engaged in criminal misconduct; (d) failed to disclose knowledge of the insurers' insolvency and corruption; (e) sold insurance to the Insureds without a Texas license; (f) sold surplus-lines insurance without the required surplus-lines insurance license and without complying with governing laws; (g) failed to understand the defects in the insuring contracts and insuring entities, or sold the policies without disclosing these defects; and (h) failed to secure better available insurance.

5. Recodified as TEX. INS. CODE ANN. §§ 541.051–162.

6. This subsection defines as unfair and deceptive acts or practices in the business of insurance

[m]aking, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading.

*See* Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548, 548–51 (repealed and recodified 2003) (current version at TEX INS. CODE ANN. §§ 541.051–.061).

7. This subsection defines as unfair and deceptive acts or practices in the business of insurance

"[f]iling with any supervisory or other public official, or making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false statement of financial condition of an insurer with intent to deceive."

*See* Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548, 548–51 (repealed and recodified 2003) (current version at TEX INS.CODE ANN. §§ 541.051–.061).

8. This subsection defines as unfair and deceptive acts or practices in the business of insurance

[m]isrepresenting an insurance policy by: (a) making an untrue statement of material

claims were included in the partial summary judgment and incorporated in the final judgment.

### 3. The Summary–Judgment Evidence

■ Our first challenge in this case has been to identify the evidence comprising the summary-judgment record. *See Arredondo v. Rodriguez*, 198 S.W.3d 236, 239 n. 1 (Tex.App.-San Antonio 2006, no pet.) ("We will not consider evidence that the trial court itself did not consider."). The Insureds assert that the evidence attached to the Brokers' reply is not properly part of the summary-judgment record because it was filed without leave of court less than 21 days before the February 7, 2005 summary-judgment hearing. The Brokers, on the other hand, argue that the reply evidence was timely because it was filed more than 21 days before a hearing held on March 18, 2005.

■ Unfiled discovery may be used in support of a motion for summary judgment if copies, appendices, or a notice containing specific references to the material are filed and served on all parties, together with a statement of intent to use such material, at least 21 days before the hearing. TEX. R. CIV. P. 166a(d). It is well-established, however, that unless there is a basis in the record to conclude that untimely material was filed with leave of court, we presume that the trial court did not consider it.[9] Thus, we cannot ascertain the exact contents of the summary-judgment evidence without first determining the date on which the motion was submitted. Due to the somewhat unclear record before us, this determination requires a discussion of the record and procedural background in greater detail than otherwise would be required.

### a. Notice

■ Notice of a summary-judgment hearing must be in writing. *See* TEX. R. CIV. P. 166a(c) (motion and any supporting affidavits "shall be filed and served at least

---

fact; (b) failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made; (c) making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact; (d) making a material misstatement of law; or (e) failing to disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of this code.

*See* Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548, 548–51 (repealed and recodified 2003) (current version at TEX. INS. CODE ANN. §§ 541.051–.061).

9. *See, e.g., Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex.1996); *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 491 n. 1 (Tex.1988); *INA of Tex. v. Bryant*, 686 S.W.2d 614, 615 (Tex.1985); *Conte v. Ditta*, No. 14–02–00482–CV, 2003 WL 21191296, at *4 n. 5 (Tex.App.-Houston [14th Dist.] May 22, 2003, no pet.) (mem.op.) (presuming that trial court did not consider a late-filed affidavit where the record showed only that the trial court considered the response). *But see Durbin v. Culberson County*, 132 S.W.3d 650, 656 (Tex.App.-El Paso 2004, no pet.) (holding that the seven-day limit before submission in which a nonmovant may submit summary-judgment evidence does not apply to the movant's reply); *Alaniz v. Hoyt*, 105 S.W.3d 330, 339–40 (Tex.App.-Corpus Christi 2003, no pet.) (holding that affidavit filed separately from the reply was untimely because it was offered in support of the motion for summary judgment, but evidence attached to the reply was properly part of the summary-judgment evidence because the evidence was offered in reply to non-movant's response). Significantly, both *Durbin* and *Alaniz* relied on *Knapp v. Eppright*, which we decided before Texas Rule of Civil Procedure 166a(d) was amended to permit unfiled discovery to be used in support of a motion for summary judgment if filed and served on all parties, together with a statement of intent to use the specified discovery, at least 21 days before the hearing. 783 S.W.2d 293, 296–97 (Tex.App.-Houston [14th Dist.] 1989, no writ).

twenty-one days before the time *specified for hearing*") (emphasis added); TEX. R. CIV. P. 21a (methods of serving notices required by the Texas Rules of Civil Procedure). In the record, we find an "Amended Notice of Oral Hearing on Defendants' Motions for Summary Judgment" which was filed on December 22, 2004. The first paragraph of the Notice states that the motion is set for oral hearing on Monday, January 31, 2005 at 1:30 p.m. Below the attorney's signature, however, is a handwritten, unsigned note, "to RESET to 2/7/05[.]" We find no other written notice of a hearing date for this motion in the record. Moreover, the parties do not dispute that the motion was submitted without oral argument on February 7, 2005.[10]

### b. Proceedings of February 9, 2005

The trial court held a telephone conference on February 9, 2005 during which the Brokers' motion for partial summary judgment was discussed. In addition, the parties and the trial court discussed the Insureds' motions to strike the Brokers' summary-judgment motion on the grounds that the Brokers set the motion for submission after a deadline specified in the court's docket control order. During this conference, the Brokers argued that the summary-judgment motion was timely because it was originally filed before the date reflected in the docket control order, but had been reset to a date after the deadline.[11]

Notably, both the parties and the trial court acknowledged on February 9, 2005 that the motion for partial summary judgment had been submitted and was under submission at that time. The conversation between the parties and the trial court proceeded in pertinent part as follows:

Court: I looked at y'all's file, and it was very active, so I thought I would just call you and *get an agenda of what you thought was on the submission docket for this past Monday or previous to that that you don't think I've ruled on yet.*

Insureds: Very well, Your Honor. I have a list in front of me.

And—and—and [Brokers' counsel], you might want to check this off as I work through it.

I have the following as motions not ruled on: . . . .

. . .

Insureds: And then we have Plaintiffs' motion to strike defendants' motions for summary judgment.

Court: Hold on. Say that again.

Insureds: Plaintiffs' motion to strike defendants' motions for summary judgment. It's basically saying they're out

---

**10.** The Brokers also assert in their brief, "Judge Jamison advised, however, *that she did not consider the evidence* [attached to the reply] in ruling that [the Insureds'] two-year claims were time-barred." (emphasis added). This statement was not accompanied by a citation, however, and in their response to the motions for rehearing filed in this court, the Brokers state that this is an incorrect quotation rather than an admission that their reply evidence was not considered. We note, however, that until we issued our original opinion in this case, the Brokers repeatedly expressed their understanding that the trial court declined to consider the reply evidence. This understanding is reflected in their Motion to Supplement and Correct Final Judgment, in which the Brokers stated, "At the 4/5/05 hearing on reconsideration, the Court orally stated that it considered only the matters of law raised in the Limitations MSJ, *without considering the evidence attached to the Defendants' Reply*." (emphasis added).

**11.** The Insureds argued that the motion was untimely because it was not set before the date specified in the docket control order.

of time—out of—on your docket control order.

*And then we have the following that was set for February 7*—yeah. This past Monday.—Defendants' motion to strike Plaintiffs' pleadings for failure to comply with Court's order. Defendants' no-evidence motion for partial summary judgment as to alter ego and sham to perpetrate a fraud. Defendants' traditional motion for partial summary judgment as to Plaintiffs' claims premised upon alleged misrepresentation regarding policy provisions. Defendants' traditional and no-evidence motion for partial summary judgment as to Plaintiff's claims for breach of fiduciary duty. *Defendants' traditional motion for partial summary judgment that Plaintiffs' negligence and 21.21 claims are time-barred.* ... That is a lot, but that's what's set, Your Honor. I—I would only point out that—that—that the summary judgment motions that have been set—all of those are the subject of Plaintiffs' motion to strike as being set outside the time period set forth in your docket control order entered June 26, 2004.

. . .

Court: [To counsel for the Brokers] How does that list comport with your list?

Brokers: I was checking them off as fast as I could, Judge. I—*I believe he's right.*

. . .

Court: Well, I can tell you that I'm not ready to rule on any summary judgment. I have been without a law clerk for a little while, and we're just getting back up to speed. So if those summary judgments were set this week, do not expect a ruling this week, but as soon as I can.

. . .

Court: Then the bases to strike the summary judgments is you believe they're beyond the deadline set in the original scheduling order?

Insureds: Yes, Your Honor. It—they—I have a scheduling order entered 6/26/2004, and it says summary judgment motions not subject to interlocutory appeal must be set by December 20, '04.

Court: All right.

Insureds: And—and these were all set after that. Actually, some were set before and taken down on the day of argument, and then they tried to reset them. One of the motions dealing with limitation has been substantially altered from when it was originally filed, but anyway, that—that's your drop-dead date.

. . .

Court: Now, then, the summary judgment motion and motion to strike the summary judgment motions.

. . .

Court: I'm talking about a motion to strike Defendants' motions for summary judgment, I thought. The basis was—

Insureds: Untimely designation—

Court:—untimely—

Insureds:—listed—

Court: All right.

Insureds: Okay.

Court: So is that true, and is that something for which the defendants are seeking leave?

Brokers: Judge, they were all filed—with the exception of one, which I'll address later, they were all filed before the DCO cutoff. There was some case law that came out on a Friday before the hearing I thought was really important, and we asked to pass those—that particular hearing and then have them reset. And then I think the other side objected. They wanted, like, another 21 days or something like that. To make a long story short, they've been out there since, I think, November, and—you know, so—[12]

Court: *Okay. I will work up these summary judgments, but no more.*

Insureds: Your Honor—there's—there's one, in particular, Your Honor. They—they filed a sur-reply to a motion for summary judgment that we'd already responded to, adding a ton of new evidence that was never in their motion, and—and—well, you'll see the—you'll see the responses when you see that. But you can't move for summary judgment on two pieces of correspondence, get a reply, then file a sur-reply adding a ton [of] evidence that you don't even have 21 days to respond to.

. . .

Court: So you are telling me that you filed motions for summary judgment before the dead—the deadline?

Brokers: Yes, Judge. The only one that was filed after the deadline was the one-satisfaction rule . . . .

Court: All right. Well, I will look at that. I may or may not rule on it. *All the others, I will rule on.* I can't tell you when, but as soon as I can get up to speed. So that takes—*the motion to strike motion for summary judgment is, basically, denied.*

. . .

Court: I think we got through our list.

So I haven't signed any orders. If anybody wants me to sign an order—I've taken some notes, and it's all on the record. And then I'll see y'all at the bond hearing *on February 25th, at which time, I may be able to give you a time when I might . . . have looked at your summary judgments because I've got some new clerks starting that will help me move that paper.*

(emphasis added).

In sum, all parties understood at the conclusion of this conference on February 9, 2005 that the Brokers' motion for partial summary judgment was submitted without oral argument on February 7, 2005. The trial court stated that it would "work up" the motion and rule on it. Nevertheless, the Brokers did not seek leave to file additional summary-judgment evidence or raise additional grounds for summary judgment less than 21 days before the submission date. As the Brokers characterized these events, "[the Brokers] reset the summary judgment hearing for February 7, 2005. . . . Twelve days *before the hearing,* the [Brokers] answered the special exceptions, *filed additional evidence* which proved that the claim was time[-]barred, and otherwise replied to [the Insureds'] response." [13]

**c. Status Conference of March 18, 2005**

The dispute concerning the submission date—and thus, the timeliness of the reply

---

**12.** The Brokers did not seek leave to file late, but asserted that the motions themselves were timely filed.

**13.** Appellees' Br., p. 10 (emphasis added).

evidence—arises from the manner in which the trial court announced the ruling on the motion on March 18, 2005. At a status conference more than five weeks after the motion for partial summary judgment was submitted, the trial court stated as follows:

> I called this party today for a status conference. . . .
>
> All of the motions that are pending that are based on untimeliness for documents that have been filed over 30 days will be denied, and those pleadings, those expert lists, et cetera, will be allowed to stand, but this is not an opportunity to open up any other deadlines for any other purposes.
>
> *And then the big news for today—you know that I have put on this morning's submission docket, on the Court's motion, the motion for summary judgment on the statute of limitations, and I have reviewed that, and I am granting that motion.* That goes—as to negligence, negligent misrepresentation, negligent supervision, and Article 21.21.[14]

(emphasis added). Significantly, the trial court did not withdraw the pending summary-judgment motion from its earlier submission. Thus, in evaluating the statement emphasized above, we cannot disregard the undisputed—and conflicting—fact that the motion was submitted more than five weeks earlier and had remained con-

tinuously under submission since that time. Taken literally, the trial court's verbal announcement cannot be reconciled with the fact that the motion for partial summary judgment was already under submission. In addition, the trial court's statement conflicts with the Texas Rules of Civil Procedure requiring written notice of a summary-judgment hearing.[15]

The Insureds alerted the trial court that the motion was already under submission and attempted to clarify the identification of documents that had already been committed to the trial court's review. Compounding the problem, however, the trial court's materials at the March 18, 2005 status conference were incomplete:

> Insureds: May I hear from you again—I—I was not listening as closely as I should have.—exactly what have you granted the summary judgment on?
>
> Court: I'll give you a copy of this order.
>
> Insureds: Okay. Your Honor, may I also ask—
>
> Court: Uh-huh.
>
> Insureds: Did you—in terms of all the pleadings that were before you, did you—did you have—there was a motion that was filed. We filed a response to it. *Then there was a reply that added a bunch of new evidence, and then we filed a reply to that objecting to it.*

---

**14.** We do not interpret the trial-court's statement, "you know" as an indication that the parties had notice of a new setting for the summary-judgment hearing. For reasons discussed further *infra*, such an interpretation would not be consistent with the record. Rather, it is apparent that the phrase was used as the sort of "filler" common in everyday, unscripted conversation. Indeed, as seen in further excerpts from the same hearing, quoted *infra*, the trial court used the phrase "you know" several times in such a manner.

**15.** *See* TEX. R. CIV. P. 21a, 166a. Moreover, the trial court's announcement also appears to conflict with the Harris County District Court rule that specifies Mondays as the date on which the submission docket is heard. *See* HARRIS (TEX.) CIV. DIST. CT. LOC. R. 3.3.3 ("Motions may be heard by written submission. Motions shall state Monday at 8:00 a.m. as the date for written submission. This date shall be at least 10 days from filing, except on leave of court."). In connection with this rule, we take judicial notice of the fact that February 7, 2005 was a Monday, but March 18, 2005 was a Friday.

*Has all that been considered?* Do we—I just want to make sure you had complete briefing.

Court: Now, let's see. I had this. I had this. I had that; although, that doesn't seem to be a file-stamped copy of that.

Insureds: The motion—

Court: I had—and—well, that's different.... I have motions for continuance going back the other way, but it's not a response to—in this folder, that's all I have that speaks to that.

Insureds: *So you don't have our reply* [sic] *to their motion for summary judgment.*[16] All—all—what—what you have is their motion for summary judgment, no reply by us, their reply to our reply, and our sur-reply to their reply.

Court: Okay. And so—

Insureds: *So we're—you're missing our response.*

Court: Which was filed when?

Insureds: It would've been filed ... February 7th, Your Honor.

Clerk: It's probably in that stack.

Court: Okay. Well, hang on a second.... See if [the law clerk] can find it.

Insureds: Okay. And—

Court: I'll certainly—

Special Master: In—

Court: Yeah.

Special Master:—the notebooks they provided me, I know I've got it.

Court: Okay. I'm going to make sure.

Insureds: And—and Your Honor, there's also—we filed a document called Plaintiffs' special exceptions and response to their motion for summary judgment.

Court: And that's not something you just—I've seen this—

Insureds: Yeah.

Court:—before.

Insureds: And we would need a—

Court: But didn't they then file their reply, basically, in answer to your special exceptions? I mean—and your special exceptions were, basically, "I don't understand"?

Insureds: Our—our special exceptions were—were, basically, this: How can you, you know, say that—for example, part of our fraud claim is that they represented—the Sovereign was one of our insurers—okay?—which—and we didn't even find out the [sic] Sovereign had gone out of business—one of the 21.21 claims was that the Sovereign was represented to be one of our insurers, and we didn't even know the Sovereign had gone out of business until—as you know, we were into that *Lexington* case for years.

Court: Right. Well, let me just say—and I'm happy to look back at anything that I may not have had in this blue file. Although, that doesn't mean I've never read it; it just isn't in this file.

And I will tell you that under Texas law, anyway, the Supreme Court and the appellate courts have rarely found there to be situations in which the facts are inherently undiscoverable....[17]

I think I've taken into consideration everything that you have. The only thing that might be a little fuzzy is

---

**16.** Based on the recitation of the documents filed, the Insureds appear to be referring to their response.

**17.** As discussed further *infra,* this was not a basis on which the Brokers moved for summary judgment.

what facts go to what cause of action....

. . .

Insureds: Your Honor—I know that you have to run, but—but I just want to make sure that—that I have—

Court: I will re—I will relook at those things, but I would not get my hopes up that I'm going to change my mind. As you know, that doesn't happen frequently.

Insureds: I—I—and I know not to try the Court's patience in that regard. Would you at least allow us to—to file a motion to ask you to consider a certain—

Court: You can always file a motion to reconsider—it's always put on the submission docket.

Insureds: Okay. Okay.

Court:—and I will do that.

Insureds: Have you overruled our special exceptions?

Court: Did you have an order?

Insureds: No. We had an order granting them.[18] Go ahead and—

Court: Okay. I—I have not overruled your special exceptions because I assumed that this reply that—again, this is not a file-marked copy, which—I believe somewhere in the body of the

reply—said because of the special exceptions, we're filing this to clear things up for you.[19]

Insureds: *But—but the problem is that that was filed with less than 10 days* [sic] *before the submission date.*[20]

Court: *Right.*

Insureds: And we're entitled to 21 days.

Court: Okay. I bet it was more than 21 days before March 18th.

Insureds: It's true *but it was not 21 days before the submission date,* which is the date on which we filed our sur-reply—

Court: That's—

Insureds:—to that—

Court: You know—

Insureds:—reply.

Court: I mean, that's—that's—that's great, and the fact that the Court has, on its own motion, set this—March 18th as a hearing date, with—*which is less than 21 days*—that may give you an appeal point. I don't know.

Insureds: Well, I'm trying the case to win it, not for appeal, Your Honor. But—

Court: You know—

Insureds: But—

Court: A win's a win.

Insureds: May we—may we—may we—

18. *See* HARRIS (TEX.) CIV. DIST. CT LOC. R. 3.3.1. ("Motions shall be in writing and shall be accompanied by a proposed order granting the relief sought.").

19. In their special exceptions, the Insureds asked the trial court to require the Brokers to refile their motion for partial summary judgment to specifically apprise them how notice, received on May 12, 1999, that the primary Lexington policy was a wasting policy started limitations running with respect to the acts described in the Insureds' petition. The Brokers' reply did not supply that connection. Instead, the Brokers asserted for the first time

that Louisiana law applied, and the alleged acts were not inherently undiscoverable. In addition, the Brokers argued that the Insureds' claims accrued when the policies were purchased, or on the dates of the Brokers' alleged misconduct, or when the Insureds first incurred defense costs in the *Derrick* litigation, or in 1995, 1996, 1998, or 1999. These arguments were based upon evidence and events that were not identified in the Brokers' motion for partial summary judgment.

20. The Brokers' reply was filed twelve days before the submission date.

Court: A win's a win. If you want to do some—you know, if you want to have a motion to reconsider—

Insureds: May we?

Court: You know, since we're—since we're going to be in trial here together for quite some time, I don't mind—I don't mind reading it.

Insureds: Thank you.

(emphasis added). Thus, the Insureds repeatedly reminded the trial court that the summary-judgment motion was already under submission at the time of the status conference. Within a week, the Insureds argued the same grounds in their Motion for Reconsideration.

### d. Order Granting Summary Judgment

In the meantime, the trial court signed the order granting summary judgment. In the order, the trial court stated, "Having considered the Motion and Response and the arguments of counsel, the Court is of the opinion that the Motion is well[-]founded and should be GRANTED." Notably, the trial court did not include the Brokers' reply among the list of items considered. And, although the Brokers later filed an untimely motion for modification of the judgment to indicate that the trial court considered their reply, the Brokers did not argue that the trial court's statements at the March 18, 2005 status conference reset the submission date on the motion and rendered their reply timely. Instead, they argued that the reply was timely because the trial court denied the Insureds' motion to strike. This argument, however, is without merit. *See Dixon v. E.D. Bullard Co.*, 138 S.W.3d 373, 376 n. 2 (Tex.App.-Houston [14th Dist.] 2004, pet. granted, judgm't vacated w.r.m.) (the denial of a motion to strike is not the equivalent of leave to file the contested evidence). The trial court did not grant the motion.

### e. Motion for Reconsideration

On April 5, 2005, the trial court heard argument on the Insureds' motion for reconsideration and concluded:

I'm not yet convinced to change my ruling on the negligence causes of action.... And by the way, even though no one really mentioned it, *I'm not going to consider the statute of limitations arguments that were in your reply. I'm going to limit it to the matter of law that you raised in your initial motion.* So I'm going to take care of that....

(emphasis added).

Although the Insureds did not devote any of their time at this hearing to their argument that the motion for summary judgment was submitted on February 7, 2005 and the reply evidence therefore was untimely, this issue was briefed in their motion for reconsideration. Thus, we understand the trial court's statement as a response to the arguments presented in the Insureds' briefing.

### f. Reply Evidence Untimely

Reviewing all of the foregoing, we conclude, for several reasons, that the Brokers' motion for partial summary judgment was submitted to the trial court on February 7, 2005, and the untimely evidence attached to the Brokers' reply is not part of the summary-judgment record.

█ First, the record establishes that the motion for summary judgment was submitted on February 7, 2005; this fact was confirmed by the parties on February 9, 2005. The Brokers do not contend that the motion was ever withdrawn from submission prior to its disposition, nor have we found any evidence in the record that this occurred. Consequently, the trial court's statement purporting to simultaneously set and rule on the motion in a single sentence cannot be given full effect.

*Cf. Int'l Ins. Co. v. Herman G. West, Inc.,* 649 S.W.2d 824, 825–826 (Tex.App.-Fort Worth 1983, no writ) (setting aside summary judgment that was "[i]n [one] breath … set and heard instanter all in one fell swoop"). Neither the Brokers nor we have located precedent in which a trial court, acting silently and sua sponte, has withdrawn a pending summary-judgment motion from consideration only to surprise the parties by spontaneously resubmitting the motion when the parties appeared for a status conference.

■ In addition, the trial court stated at the hearing on the motion for reconsideration that it did not consider the statute-of-limitations arguments contained in the reply. Because the Brokers moved for partial summary judgment on the ground that the Insureds' claims were barred by limitations, further timely elaboration of the same grounds would have been properly considered by the trial court. Indeed, because the Brokers moved for partial summary judgment solely on the ground that the Insureds' claims were barred by the two-year statute of limitations, this was the *only* basis for summary judgment that the trial court could properly consider. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 339 (Tex.1993) (plurality op.) ("**The motion** for summary judgment must **itself** state specific grounds on which judgment is sought.... **The motion** for summary judgment must stand or fall on the grounds it specifically and expressly sets forth...."). Thus, if the true submission date were March 18, 2005, then the Brokers' reply would have been timely, and the trial court properly could have considered the statute-of-limita-

tions argument contained in the reply. But if, as we conclude, the motion was submitted on February 7, 2005, then the reply evidence offered in support of the limitations argument was untimely, and thus, properly excluded from consideration.

■ Our conclusion that the trial court did in fact decline to consider this evidence is consistent with the order on the judgment, in which the trial court stated that the motion and response were considered, but did not mention the reply. *See K–Six Television, Inc. v. Santiago,* 75 S.W.3d 91, 96 (Tex.App.-San Antonio 2002, no pet.). In *K–Six Television,* the nonmovant filed responses to separate motions for traditional and no-evidence summary judgment, followed by an untimely amended response to the no-evidence motion. *Id.* Upon review, the Fourth Court of Appeals noted that, in its order on each motion, the trial court recited that it considered the response, but did not state that it considered the amended response. *Id.* The appellate court's refusal to consider the amended response accorded with the unrebutted presumption that the trial court did not consider a response that was filed late without leave to do so. *See id.* Here, too, the language of the order on the motion for partial summary judgment supports the presumption that the trial court did not consider the reply evidence that was filed late and without leave of court.[21] And although permission to file a late response may be reflected in a "separate order," "a recital in the summary judgment," or an oral ruling contained in the reporter's record of the summary-judg-

---

21. We do not give conclusive effect to the use or non-use of commonly-employed decretal words. *Constance v. Constance,* 544 S.W.2d 659, 660 (Tex.1977). We note, however, that the trial court's statement that it considered the motion and the response is not "decretal."

*See State v. Reagan County Purchasing Co.,* 186 S.W.2d 128, 134 (Tex.Civ.App.-El Paso 1944, writ ref'd w.o.m.) (explaining that "decretal" means the granting or denying of the remedy sought).

ment hearing,[22] none of those are present here. On this record, we decline to hold that the presumption that the trial court did not consider late-filed evidence has been rebutted by the trial court's statement that it "put on this morning's submission docket, on the Court's motion, the motion for summary judgment on the statute of limitations. . . ."[23]

### 4. Brokers' Failure to Disprove Application of Discovery Rule

■■■■ At a minimum, grounds for summary judgment must be mentioned in the motion. *Roberts v. Sw. Tex. Methodist Hosp.*, 811 S.W.2d 141, 145–46 (Tex.App.-San Antonio 1991, writ denied). Thus, we cannot affirm summary judgment for reasons not expressed in the motion, even if the evidence would support judgment on

---

**22.** *Neimes v. Ta*, 985 S.W.2d 132, 138–39 (Tex.App.-San Antonio 1998, pet. dism'd) (holding that if the record does not contain an affirmative indication that the trial court permitted a late filing, then the filing is a nullity).

**23.** *Cf. Robinson v. State*, 240 S.W.3d 919, 923 (Tex.Crim.App.2007) (discussing record in which it could not be determined whether the trial court denied a motion based on the merits or on a procedural issue). In *Robinson*, the trial court denied a motion filed pro se by a party who was represented by counsel. The Court held that the trial court properly could have refused to consider the motion, or could have considered the motion on its merits. *Id.* The Court further stated, "It would obviously be better in the future if trial courts made it clear in the record exactly which of the two options they choose. . . ." *Id.* Because the record was unclear, the Court remanded the case to the appellate court "so that it may undertake to determine" which option was exercised.

Although we do not consider the trial court's orders ambiguous, we note that we would reach the same result under that analysis. "The same rules of interpretation apply in construing the meaning of a court order or judgment as in ascertaining the meaning of other written instruments. The entire contents of the instrument and record should be considered. The judgment is to be read as a

---

that basis. *See id.* ("When a motion for summary judgment asserts grounds *A* and *B*, it cannot be upheld on grounds *C* and *D*, which were not asserted, even if the summary judgment proof supports them and the responding party did not except to the motion.").

#### a. Failure to Prove Dates on Which Claims Accrued

Here, the Brokers challenged the Insureds' claims of negligence, negligent supervision, negligent misrepresentation, and violations of article 21.21 of the Texas Insurance Code on the sole ground that these claims are barred by limitations, and the trial court acknowledged that it did not consider the limitations arguments stated in the Brokers' reply.[24] On this record, we

---

whole." *Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 404–05 (Tex.1971); *Mai v. State*, 189 S.W.3d 316, 320 (Tex.App.-Fort Worth 2006, pet. ref'd) (construing an ambiguous order). In *Lone Star Cement*, the Texas Supreme Court first noted that an ambiguous order could be "construed in light of the motion upon which it was granted" if a written motion was filed, but explained that no written motion was available in that case. *Lone Star Cement*, 467 S.W.2d at 404. The Court held that "that the order and record considered as a whole as well as the conduct of the parties and trial court subsequent to the order dictate[d] [the] construction" of the trial court's order. *Id.* at 405; *see also Wilde v. Murchie*, 949 S.W.2d 331, 333 (Tex.1997) (per curiam) (considering the parties' subsequent actions in construing an ambiguous judgment). Moreover, "[a] judgment should be construed as a whole toward the end of harmonizing and giving effect to all the court has *written*." *Point Lookout W., Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex.1987) (per curiam) (emphasis added).

**24.** *See* Tex. R. Civ. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex.1997) ("A motion for summary judgment must itself expressly present the grounds upon which it is made, and must stand or fall on these

conclude that the Brokers failed to conclusively establish their right to summary judgment on these claims.

■ A defendant moving for summary judgment on limitations grounds has the burden to prove the date on which the cause of action accrued. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). Generally, the determination of this date is a question of law. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). In most cases, a cause of action accrues and the statute of limitations begins to run when a wrongful act causes a legal injury, even if the fact of injury is not immediately discovered. *Id.; Franco v. Slavonic Mut. Fire Ins. Ass'n,* 154 S.W.3d 777, 789 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex. 1990)). But, if the discovery rule applies and has been invoked by the plaintiff, a defendant moving for summary judgment on the affirmative defense of limitations has a "dual burden." [25] The defendant then must not only conclusively prove when the cause of action accrued, but also must establish, as a matter of law, that there is no genuine issue of material fact about when the plaintiff discovered, or in

the exercise of reasonable diligence should have discovered, the nature of its injury. *KPMG Peat Marwick,* 988 S.W.2d at 748; *Burns v. Thomas,* 786 S.W.2d 266, 267 (Tex.1990).

Here, the Brokers' motion for partial summary judgment is directed at only half of their burden. Although the Insureds invoked the discovery rule in their pleadings, the Brokers did not assert in their motion that the discovery rule is inapplicable. Instead, the Brokers argued and offered evidence that the Insureds knew, by May 12, 1999, that the two Lexington primary policies were wasting policies. As the Insureds point out, this evidence failed to establish the date of accrual of any of their negligence claims—even those arising from the Brokers' placement of the two primary Lexington CGL policies. [26] Likewise, the Brokers did not argue or demonstrate that the discovery rule is inapplicable to the Insureds' claims pursuant to article 21.21 of the Insurance Code. *See* TEX. INS. CODE ANN. art. 21.21, § 16(d) (Vernon Supp.2001) ("All actions under this Article . . . must be commenced within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discover-

---

grounds alone."); *McConnell,* 858 S.W.2d at 341 (concluding that the trial court may not consider a brief in support of a motion for summary judgment in determining whether summary judgment grounds and issues are expressly presented); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital,* 192 S.W.3d 20, 25 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (stating that, absent agreement of the parties, new grounds may not be asserted in a movant's reply).

**25.** David Hittner & Lynne Liberato, *Summary Judgments in Texas,* 47 S. TEX. L. REV. 409, 480 (2006).

**26.** *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex. 1998) ("A cause of action generally accrues,

and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy."); *Moreno,* 787 S.W.2d at 351 ("[A] cause of action can generally be said to accrue when the wrongful act effects an injury."); *All–Tex Roofing, Inc. v. Greenwood Ins. Group, Inc.,* 73 S.W.3d 412 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (in claim for negligent placement of insurance with an insolvent insurer, claim did not accrue until insured was denied indemnification); *Gilbreath v. White,* 903 S.W.2d 851, 856 (Tex.App.-Texarkana 1995, no writ) (holding that legal injury occurred for purposes of negligence action against insurance agent when insurance company rejected the claim).

ed the occurrence of the unfair method of competition or unfair or deceptive act or practice.").[27]

### b. No Subsequent Findings Render Error Harmless

 Relying on *Progressive County Mutual Insurance Co. v. Boyd*, the Brokers respond that any error in the partial summary judgment was harmless because evidence offered at trial proved that the Insureds' claims were time-barred. *See* 177 S.W.3d 919, 921 (Tex.2005) (per curiam) (noting that "a trial court's erroneous decision to grant summary judgment can be rendered harmless by subsequent events in the trial court"). Because this argument applies somewhat differently to the various insurance policies, we discuss the 1991 and 1992 placements separately from the 1993 and 1994 policies.

### (i) 1991 and 1992 Placements

At the outset, we note that the facts of *Boyd*, on which the Brokers rely, differ significantly from those presented here. In *Boyd*, a jury found that the insured lacked coverage for the asserted claim; thus, the insurer had no liability on the insured's extracontractual claims as a matter of law, and the *Boyd* court held that any error in granting the summary judgment was harmless. *Id.* at 921–23. Here, the Insureds filed suit against their Brokers, and neither the trial court nor the jury made findings concerning coverage under the 1991 or 1992 placements. Thus, unlike the circumstances presented in *Boyd*, there are no findings to measure against the summary judgment to determine if error in the judgment was harmless.

The Brokers next contend that, to recover under article 21.21, the Insureds were required to prove that the British American insurers failed to pay a covered claim. According to the Brokers, the Insureds failed to meet this burden of proof at trial.[28] But this argument is also unavailing. Because the trial court granted summary judgment as a matter of law on the Insureds' claims under this provision, these claims were not litigated at all. Thus, no findings were made or rulings rendered concerning coverage under these placements.

### (a) No Proof of Settlement

27. If late filing of the reply evidence was permitted by the trial court, we still would conclude that the partial summary judgment incorporated in the final judgment was overly broad. For example, the Insureds' claims concern ten insurance policies, but the Brokers did not produce evidence concerning the allegations of the Brokers' "failure to promptly notify" any insurer other than Lexington. On April 29, 1996, Lexington notified the Insureds that it did not learn of *Derrick I* until March 12, 1996. But there is no indication of the date when the Insureds should have known of any injury arising from this failure. *Cf. PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 631 (Tex.2008) (insured's failure to timely notify its insurer of a claim does not defeat coverage if the insurer was not prejudiced by the delay). And with regard to the six remaining policies, there is no evidence connecting the Brokers' grounds for summary

judgment with the Insureds' factual allegations.

Another of the Insureds' negligence claims is based on allegations that the Brokers placed coverage with financially unsound insurers and insurers with unsound management. But the Brokers' offered evidence shows only that the Insureds knew of Anglo American's insolvency by June 13, 1998. Anglo American underwrote 23.07% of the 1991–92 CGL policy and 75% of the 1992–93 CGL policy. The Brokers produced no evidence regarding the Insureds' knowledge that any underwriters of the remaining eight policies were financially unsound or improperly managed.

28. The Brokers do not contend that the Insureds' negligence claims are barred on these grounds.

The Brokers also argue that contribution by the British American insurers to the settlement of the underlying claim establishes, as a matter of law, that the British American insurers did not fail to pay a covered claim. Contrary to the Brokers' suggestion, however, the record does not establish that all of the British American insurers contributed to the settlement of the *Derrick* litigation, or that the Insureds settled their coverage claims against all of the British American insurers. Thus, even assuming without deciding that the Insureds' claims against the Brokers arising under article 21.21 in connection with the 1991 and 1992 placements would be extinguished if all of the British American insurers contributed to the settlement and the Insureds released their claims against all of these insurers, these facts have not been established on the record.

### (b) "One Satisfaction Rule" Argument Not Preserved

In a related argument, the Brokers contend that the Insureds' claims against them are barred by the "one satisfaction rule." [29] Under this rule, nonsettling defendants may claim a credit based on the damages for which all tortfeasors are jointly liable and for which the plaintiffs have already received payment. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex.2000). The Brokers argue that the Insureds' settlements with some of the insurers effectively relieved the Brokers of liability, if any, arising from their sales to the Insureds. The Brokers, however, have not established the applicability of the "one-satisfaction rule" as a matter of law; thus, we cannot affirm the judgment on this basis. [30] For example, in their settlements with Lexington Insurance Company, American International Group, Inc., Risk Specialists Companies, Inc., Southern Risk Specialists, Inc., Landmark Ins. Co., and American International Specialty Lines Insurance Company in connection with policies 5535615, 5108647, 200499, 200501, and AH9900384, the Insureds expressly reserved their claims against the Brokers. The Insureds similarly reserved their claims against the Brokers when settling the liability, if any, of the British American insurers under policies 92BAGL145, 92BA519, and 92BA236, effective in 1992–93. In their briefing, however, the Brokers make no distinction between settlement agreements that contain such reservations and those that do not. *See* Tex. R. App. P. 38.1(h); 38.2(a).

In sum, we conclude that the trial court's error in granting summary judgment concerning the 1991 and 1992 placements was not rendered harmless by subsequent events demonstrated in the record. We therefore reverse the portion of the judgment concerning the Insureds' claims of negligence, negligent supervision, negligent misrepresentation, and violation of article 21.21 of the Insurance Code arising in connection with the 1991 and 1992 British American placements.

### (ii) The 1993 and 1994 Placements

---

**29.** Although the Brokers filed a separate motion for summary judgment on this basis, they do not discuss those proceedings in their brief.

**30.** *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993) (stating the general rule that a reviewing court cannot affirm summary judgment on grounds not presented in the motion); *see also* Lee R. Russ & Thomas F. Segalla, 15 Couch On Insurance 3d § 216:34 (2007) (indicating that settlement with an insurer does not release claims against the insurance agency or agent if claims against them are specifically reserved or if the claim against the insurer, which sounds in contract, is separate from the claim against the agency).

As previously discussed, the Brokers asserted that the Insureds' claims for negligence, negligent misrepresentation, negligent supervision, and violations of article 21.21 accrued on May 12,1999, when Lexington's attorney first notified the Insureds that defense costs reduced their insurance limits. The correspondence from Lexington on which the Brokers rely only addresses coverage under Lexington's primary policies; none of the correspondence addresses the Lexington umbrella policies. Thus, the Brokers have failed to conclusively establish their right to summary judgment regarding the umbrella policies. Regarding the Lexington CGL policies, the Insureds responded that limitations concerning the 1993 and 1994 placements did not begin to run until the day Lexington denied coverage or the day the Insureds became liable to pay a judgment or settlement in excess of policy limits, because the mere potential exhaustion of primary policy limits before judgment or settlement was not an injury-producing event.

Generally, the injury-producing event in a first-party insurance claim occurs when an insurer unreasonably fails to pay an insured under the policy. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 829 (Tex.1990). The Brokers acknowledged this proposition in their motion, arguing that "all facts required for a cause of action existed no later than when the Lexington policy limits were exhausted, and not when the ... declaratory judgment action regarding coverage was resolved at a later date." Nevertheless, the Brokers' motion was not supported by evidence es-

tablishing that the limits of the Lexington policies were exhausted more than two years before the Insureds filed suit.[31]

On appeal, the Brokers argue that because the Insureds are charged with knowledge of the policies' contents, the challenged claims against Lexington accrued on the dates in 1993 and 1994 on which the Insureds purchased the respective policies.[32] In support of this argument, the Brokers rely on *Mauskar v. Hardgrove*, No. 14–02–00756–CV, 2003 WL 21403464 (Tex.App.-Houston [14th Dist.] June 19, 2003, no pet.) (mem.op.) (holding that limitations on an insured's claims of negligent procurement, negligent misrepresentation, and violations of the Insurance Code and Deceptive Trade Practices Act began to run when insured purchased life insurance coverage, and the discovery rule did not apply because the nature of the injury was not inherently undiscoverable). *But see All–Tex Roofing*, 73 S.W.3d at 415–16 (holding that insured's causes of action against a broker for negligence and DTPA violations based on the broker's actions in placing insurance with an insolvent insurer did not accrue until the insurer should have paid a claim but failed to do so).

In *Mauskar*, it was undisputed that the insured would have discovered the misrepresentations by reading the policies; the summary-judgment evidence demonstrated that the insured received written descriptions of the policies, but simply failed to read them. *Mauskar*, 2003 WL 21403464, at *3. But here, as in *All–Tex*, the insolvency of the insurers was not

---

**31.** The two-year statute of limitations applicable to the Insureds' negligence claims is the shortest limitations period applicable to the case.

**32.** The Brokers did not assert this ground in their motion for partial summary judgment.

Although the Brokers did raise this argument in their reply, the trial court stated that it did not consider the limitations arguments set forth in the reply brief, and the Brokers do not assert that the trial court erred in refusing to consider these arguments.

evident from any policies, cover notes, or descriptions received by the Insureds. Moreover, reading the policies or the cover notes would not reveal that Guidry was not licensed to sell surplus-lines policies in Texas, or that better insurance was available. Thus, the facts of this case are readily distinguishable from those in *Mauskar* and more closely resemble the facts in *All–Tex.*

For the reasons discussed above, we conclude that the trial court erred in granting partial summary judgment on the grounds and summary-judgment evidence presented. On this record, the Brokers have failed to conclusively establish that the Insureds' claims of negligence, negligent supervision, negligent misrepresentation and violations of section 21.21 of the Texas Insurance Code are time-barred. We therefore reverse that portion of the final judgment incorporating the trial court's partial summary judgment based on limitations.

### B. Brokers' Motion for Directed Verdict on Insureds' Claims for Breach of Fiduciary Duty

 In their second issue, the Insureds argue that the trial court erred in granting the Brokers a directed verdict on the Insureds' claims for breach of fiduciary duty because the Insureds raised fact issues regarding the existence of a formal or an informal fiduciary relationship. In a subsidiary argument, the Insureds contend that the statute of limitations was tolled because a fiduciary relationship exists and it is presumed that their injury was inherently undiscoverable.

---

**33.** In support of this contention, the Insureds cite *Don Chapman Motor Sales, Inc. v. National Savings Insurance Co.,* 626 S.W.2d 592, 597 (Tex.App.-Austin 1981, writ ref'd n.r.e.).

### 1. Standard of Review

 Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not permit reasonable jurors to decide otherwise. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). Accordingly, the test for legal sufficiency is the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review. *Id.* When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the Insureds and indulge every reasonable inference that would support it. *See id.* We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

### 2. Formal Fiduciary Relationship

The Insureds first argue that a determination of whether a broker is an agent of the insured is a question of fact.[33] According to the Insureds, they raised a fact issue concerning whether the Brokers had a formal fiduciary relationship with the Insureds. The Insureds rely on case law in which courts note that an insurance agent "acts for the insured in making the application for insurance and processing the policy"[34] and on non-insurance cases addressing the duties generally owed by an agent to his principal.[35]

---

**34.** *See Guthrie v. Republic Nat'l Life Ins. Co.,* 682 S.W.2d 634, 637 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.).

**35.** *See Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex.2002) (holding that an agent owes a fiduciary duty to his principal).

Although the existence of facts giving rise to a fiduciary duty is a question for the factfinder's determination, the issue of whether those facts give rise to a formal fiduciary relationship is a question of law. *See Brewer & Pritchard, P.C. v. Johnson,* 7 S.W.3d 862, 867 (Tex.App.-Houston [1st Dist.] 1999), *aff'd,* 73 S.W.3d 193 (2002); *Fuqua v. Taylor,* 683 S.W.2d 735, 737–38 (Tex.App.-Dallas 1984, writ ref'd n.r.e.). " '[N]ot every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.' " *Meyer v. Cathey,* 167 S.W.3d 327, 330 (Tex.2005) (quoting *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 176–77 (Tex.1997)). The Insureds cite no case recognizing a formal fiduciary relationship between an insured and its insurance broker, or the agency employing the broker, or the owner of the agency. In contrast, the Brokers support their argument that they did not owe any fiduciary duties to the Insureds with *Choucroun v. Sol L. Wisenberg Insurance Agency–Life & Health Division, Inc.* and the cases cited therein.[36]

Significantly, the Insureds did not bring forward any evidence in their case-in-chief that a fiduciary relationship existed between the parties. On appeal, the Insureds argue generally that "[t]he trial record speaks for itself and contains ample evidence of Defendants' fraud, breach of fiduciary duty[,] and statutory violations. Plaintiffs cannot replicate herein the extensive documents and days of testimony admitted to the jury." The Insureds contend that a formal fiduciary relationship existed because the Brokers (a) "selected and recommended insurers and coverage" to the Insureds, (b) "prepared and processed" the Insureds' applications for insurance, and (c) procured the policies and delivered them to the Insureds in Texas.

In support of these contentions, the Insureds primarily rely on testimony from Mary Wallace, the Insureds' employee who testified that her "main responsibilities" were to handle "human resources/benefits," but that she also "was more or less just the liaison between Environmental Procedures and the Dwight Andrus insurance agency [and] George Guidry[.]" But Wallace was not "the decision-maker regarding insurance" for the Insureds. Wallace testified, "We looked towards George Guidry as our trusted advisor. It was his expertise in the insurance industry. That was his business. We looked for him on what we needed to do to have insurance for our business." Wallace stated that Guidry "selected the [insurance] companies[,]" and she described the insurance application process as follows:

> The preliminary preparation was normally done in Andrus's office.... Then it was brought to Houston, along with the presentation, and then the balance of it—it was reviewed. If there was [sic] any changes to be made, any additions to be made to it, then it was changed, and then ultimately, it was signed by ... the secretary/treasurer of the [appellant] corporation[s].

After reviewing the evidence, we conclude that reasonable and fair-minded people could not conclude that a formal fiduciary relationship existed between the

36. *See* No. 01–03–00637–CV, 2004 WL 2823147, at *4 (Tex.App.-Houston [1st Dist.] Dec. 9, 2004, no pet.) (mem.op.) (holding that an insurance agent "owed no duty to explain the terms of the insurance policy to [the insured] or to advise him on other, alternative policy coverages" (citing *Critchfield v. Smith,* 151 S.W.3d 225, 230 (Tex.App.-Tyler 2004, pet. denied); *Moore v. Whitney–Vaky Ins. Agency,* 966 S.W.2d 690, 692 (Tex.App.-San Antonio 1998, no pet.); and *Pickens v. Tex. Farm Bureau Ins. Cos.,* 836 S.W.2d 803, 805 (Tex.App.-Amarillo 1992, no writ))).

Brokers and Insureds. *See Pickens,* 836 S.W.2d at 805 (stating that an insurance agent has no duty to procure additional coverage for a customer "merely because the agent has knowledge of the need for additional insurance of that customer, especially in the absence of evidence of prior dealings where, the agent customarily has taken care of his customer's needs *without consulting him*" (emphasis added)). A formal fiduciary relationship is one created by law or by the nature of the contract between the parties. *Peckham v. Johnson,* 98 S.W.2d 408, 416 (Tex.Civ.App.-Fort Worth 1936), *aff'd,* 132 Tex. 148, 120 S.W.2d 786 (1938). The existence of a formal fiduciary relationship is determined by the relationship between the parties, and if such a relationship is established, questions of whether one party relied on or confided in the other are immaterial. *Johnson v. Peckham,* 132 Tex. 148, 151–52, 120 S.W.2d 786, 788 (1938) (addressing the formal fiduciary relationship of partners).[37] In this case, however, the Insureds cite no binding precedent recognizing a formal fiduciary relationship under similar facts, and our own research has revealed none.

 Courts do not create fiduciary relationships lightly. *Schlumberger Tech. Corp.,* 959 S.W.2d at 177. And as an intermediate appellate court, we decline to extend the set of formal fiduciary relationships to encompass the relationship of an insurance agent, agency, or broker to a client. *See T.F.W. Mgmt., Inc. v. Westwood Shores Prop.,* 79 S.W.3d 712, 720 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (declining to create a fiduciary duty requiring the owner of a country club to provide an accounting to a property owners' association of fees the association provided to the club); *Emscor Mfg., Inc. v. Alliance Ins. Group,* 879 S.W.2d 894, 910 (Tex.App.-Houston [14th Dist.] 1994, writ denied) ("It is not for an intermediate appellate court to create new causes of action.").

### 3. *Informal Fiduciary Relationship*

 The Insureds also contend that the trial court erred in granting a directed verdict regarding the Insureds' breach-of-fiduciary-duty claims because the evidence raised questions of fact regarding whether an informal fiduciary relationship existed between the parties. When a business transaction is involved, "the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 288 (Tex.1998). After reviewing the record under the applicable standard of review, we conclude that the evidence would not permit reasonable and fair-minded people to conclude that a confidential relationship existed between the Insureds and Brokers prior to the transactions which are the subject of the Insureds' claims.

We overrule the Insureds' second issue; hence, we do not reach their subsidiary argument that when a fiduciary relationship exists, it is presumed that the injury caused by a breach of fiduciary duty is inherently undiscoverable, which thereby tolls the statute of limitations.

### C. Insureds' Motion for Judgment Notwithstanding the Verdict

### 1. *Standard of Review*

 In their third issue, appellants contend the trial court erred in failing to render judgment notwithstanding the verdict ("JNOV") on appellants' claims under

---

**37.** However, evidence of trust and reliance predating the business relationship is material in determining whether an informal fiduciary relationship exists.

the Unauthorized Insurance Act[38] because it is undisputed that the Act applies to the 1991 and 1992 British American placements and the evidence conclusively establishes that the "independent procurement" exception does not apply as a matter of law.[39] Judgment notwithstanding the verdict is proper when (a) a defect in the opponent's pleadings makes the pleadings insufficient to support a judgment, (b) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law, or (c) the evidence offered on a cause of action is insufficient to raise an issue of fact. *Apache Corp. v. Dynegy Midstream Servs., Ltd.,* 214 S.W.3d 554, 559 (Tex.App.-Houston [14th Dist.] 2006, pet. granted). In analyzing the trial court's ruling on a JNOV motion, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless a reasonable juror could not. *Id.* at 558–59.

### 2. No Independent Procurement

 Under the Act, an insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer, and a person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay.[40] An exception exists if the insurance is independently procured, which requires, *inter alia,* that negotiations for the insurance occur entirely outside the State of Texas. TEX. INS. CODE ANN. § 101.053(b)(4)(A). As the party relying on the exception, the Brokers bore the burden to prove that the insurance at issue was independently procured. *See Risk Managers Int'l v. State,* 858 S.W.2d 567, 570 (Tex.App.-Austin 1993, writ denied). It is undisputed that Guidry presented insurance proposals and negotiated insurance contracts with appellants in Texas. Thus, as a matter of law, the insurance was not independently procured. *See id.* at 570–71.[41]

The Brokers argue that the law regarding the independent-procurement exception was unclear at the time the British American coverage was placed, and was not clarified until 1993, when the Third Court of Appeals decided *Risk Managers.* We disagree. Since 1967, the substance of the Act has provided:

> Except for lawfully procured surplus lines insurance and contracts of insurance independently procured through negotiations occurring entirely outside of this state ... any contract of insurance effective in this state and entered into by an unauthorized insurer is unenforceable by such insurer. In the event

---

**38.** Recodified as TEX. INS. CODE §§ 101, *et. seq.*

**39.** We need not address all of the points on which we differ from our concurring and dissenting colleague; a point-by-point refutation adds nothing of value to a discussion in which it is clear that the members of the panel disagree regarding the content and meaning of the record, the briefs, and the caselaw.

**40.** V.A.T.S. Insurance Code, art. 1.14–1, §§ 2(b), par. 4, 3, *repealed by* Act of April 30, 1999, 76th Leg. R.S., ch. 101, § 5, 1999 Tex.

Gen. Laws 486, 538, eff. Sept. 1, 1999; now codified at TEX. INS. CODE ANN. § 101.201(a) (Vernon Supp.2008).

**41.** *See* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 6, 1999 Tex. Gen. Laws 486, 538 ("This Act is intended as a recodification only, and no substantive change in law is intended by this Act."); Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 27, 2003 Tex. Gen. Laws 3611, 4139 (same). *Yorkshire Ins. Co., Ltd. v. Seger,* 279 S.W.3d 755, 763 (Tex.App.-Amarillo 2007, pet. denied).

of failure of any such unauthorized insurer to pay any claim or loss within the provisions of such insurance contract, any person who assisted or in any manner aided directly or indirectly in the procurement of such insurance contract shall be liable to the insured for the full amount thereof pursuant to the provisions of such insurance contract.[42]

Throughout that time, the business of insurance has been statutorily defined to include, *inter alia*, "[t]he issuance or delivery of contracts of insurance to residents of this state or to persons authorized to do business in this state," and "directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another person or insurer in the solicitation, negotiation, procurement[,] or effectuation of insurance or renewals thereof or in the dissemination of information as to coverage or rates...."[43]

Amendments of the Act prior to the publication of *Risk Managers* worked no substantive change applicable here. For example, in 1993, the language of the exception was changed from "lawfully procured surplus lines insurance" to "insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer," and it is undisputed that Guidry did not have a license as a Texas surplus-lines agent at any relevant time. Moreover, the insurance contracts were negotiated in part in Texas and were delivered in Texas. Thus, under the unambiguous language of the governing statute, the insurance was not independently procured.

Because the evidence conclusively established that the 1991 and 1992 British American insurance policies were not independently procured, the trial court erred in submitting Question Nine to the jury. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex.1997) ("A court may be entitled to decide an issue as a matter of law when there is no conflict in the evidence....").

### 3. Result of Trial Court Error

■■■■ "Absent some showing of extraneous prejudice, the submission of a question of law is harmless: if it is answered as the court should have decided, it can hardly damage; if it is answered to the contrary, the finding would be immaterial and hence should be ignored." *Med. Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 826 (Tex.App.-Houston [14th Dist.] 1988, writ denied). Here, Question Nine was submitted as the predicate to Question Ten, in which the jury was asked, "Was there a failure to pay any claim or loss arising out of the Derrick litigation that was owed to Plaintiffs within the provision of the Cover Notes?" The jury was asked to answer "yes" or "no" with regard to the "1991 [British American] cover notes" and the "1992 [British American] cover notes." However, the instructions accompanying Question Ten directed the jury to answer that question only if it answered "No" as to the 1991 or 1992 British American cover notes. Because the jury answered Question Nine incorrectly, it did not reach Question Ten.[44]

---

42. V.A.T.S. Insurance Code, art. 1.14–1, §§ 8, *added by* Act of April 27, 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex. Gen. Laws 400, 406, *amended by* Act of May 27, 1993, 73rd Leg., R.S., ch. 999, § 3, 1993 Tex. Gen. Laws 4373, 4374, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538, now codified at TEX. INS. CODE ANN. § 101.201.

43. V.A.T.S. Insurance Code, art. 1.14–1, §§ 2(a)(5) and (6), *added by* Act of April 27, 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex. Gen. Laws 400, 401–02.

44. Question 10 was the predicate to Questions 11 and 12; thus, by answering Question 9 incorrectly, the jury failed to answer as many as three additional jury questions.

The Insureds objected at the charge conference that there was no evidence to support the submission of Question Nine, but they did not object to the conditioning instructions in questions Ten, Eleven, and Twelve. After the trial, the Insureds filed a motion for judgment notwithstanding the verdict and a supporting brief in which they asserted that the trial court should disregard the jury's answer to Question Nine because, as a matter of law, the cover notes were not independently procured.[45] In addition, the Insureds argued that the evidence at trial conclusively established that at least two insurers failed to fully pay covered claims.[46] Finally, the Insureds asked the trial court to enter judgment against the Brokers in the amount of $10,875,101.13 for the Insureds' actual damages; $2,098,994.00 in attorneys' fees; conditional awards of $350,000.00 and $200,000.00 in the event of appeals, respectively, to the intermediate court and the Texas Supreme Court; and costs and interest.

▮▮▮ After reviewing the record under the appropriate standard of review, we are not persuaded that the trial court erred in denying the Insureds' JNOV motion. We first note that the Insureds do not specifically contend that they were harmed by the erroneous submission, but instead argue that they are entitled to judgment on their Unauthorized Insurance Act claims as a matter of law because the insurance was not independently procured. The Brokers respond that the Insureds did not prove the other elements they were required to prove in order to recover (i.e., failure to pay a covered claim), and the Insureds reply that (a) coverage was not contested, and (b) the Brokers' expert testified that the claims were covered. The record, however, demonstrates that coverage was disputed, and because the existence of coverage is a question of law,[47] it is not conclusively established by expert opinion testimony. See *Lubbock County v. Strube*, 953 S.W.2d 847, 857 (Tex.App.-Austin 1997, pet. denied) (stating that expert opinion testimony is not probative of a pure question of law).

▮▮▮ Although the Insureds conclusively established that the insurance was not independently procured, this indicates only that the jury's answer to Question Nine should be disregarded, and does not provide a basis for judgment as a matter of law or for a new trial on the Unauthorized Insurance Claims. On appeal, the Insureds have provided no argument, citations to the record or to authorities, and no analysis showing that the trial evidence conclusively proved liability and damages as to the Unauthorized Insurance Claims. These elements were the subject of jury questions which, in accordance with the conditioning instructions, the jury did not

---

45. As discussed further *infra*, the Insureds also asked the trial court to disregard the jury's answer to Question Thirteen, which concerns the Insureds' attorneys' fees. *But see Wagner v. Edlund*, 229 S.W.3d 870, 877 (Tex.App.-Dallas 2007, pet. denied) (reversing portion of JNOV concerning attorneys' fees and stating, " '[a] trial court may not disregard a jury's answer because it is against the great weight and preponderance of the evidence. In such a situation, the trial court may only grant a new trial' " (quoting *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 594 (Tex.1986))).

46. According to the Insureds' brief in support of their motion for judgment notwithstanding the verdict, Ocean Marine and Anglo American failed to pay the full amount of the Insureds' losses in connection with the litigation and settlement of the *Derrick* suits.

47. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, —— S.W.3d ——, ——, 2008 WL 746522, at *1 (Tex.App.-Houston [1st Dist.] March 20, 2008, no pet.).

answer. Because the Insureds did not object to these instructions, they have waived error arising from the jury's failure to answer the associated liability and damages questions.[48] The answers to these questions are not supplied by implication: we cannot know whether the jury, if it had reached Question Ten, would have determined that one or more of the insurers under the 1991 or 1992 CGL or umbrella cover notes failed to pay a covered claim or loss. *See Carl J. Battaglia, M.D., P.A. v. Alexander,* 177 S.W.3d 893, 903 (Tex. 2005). But, by failing to object to the conditioning instructions, the Insureds waived their right to a new trial to allow a jury to answer these questions.[49] We therefore overrule the Insureds' third issue.

### D. Exclusion of Trade Publication

In their fourth issue, the Insureds argue that the trial court committed reversible error by excluding as hearsay two issues of *Surplus Lines Reporter*

*& Insurance News,* an industry trade publication. We review a trial court's evidentiary rulings for an abuse of discretion. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex.2005) (per curiam). The trial court abuses its discretion if it acts without reference to guiding rules or principles, or in an arbitrary or unreasonable manner. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). To reverse a judgment based on a claimed error in admitting or excluding evidence, a party must show that the error probably resulted in an improper judgment. TEX. R. APP. P. 44.1(a); *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001). To assess whether the excluded evidence caused such harm, we review the entire record. *Interstate Northborough P'ship,* 66 S.W.3d at 220. We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

48. *See Little Rock Furniture Mfg. Co. v. Dunn,* 148 Tex. 197, 203–04, 222 S.W.2d 985, 989–90 (1949) (holding party that failed to object to instruction conditioning submission of a jury's question on its answer to a question waived that party's right to have the jury make findings as to the subsequent question), *modified on other grounds by Bradford v. Arhelger,* 161 Tex. 427, 340 S.W.2d 772 (1960); *Tex. Employers' Ins. Ass'n v. Ray,* 68 S.W.2d 290, 295 (Tex.Civ.App.-Fort Worth 1933, writ ref'd) (holding appellant could not complain of jury's failure to answer question because the charge instructed the jury not to do so based on its answer to a prior question and because appellant did not object to this instruction); *Hunter v. Carter,* 476 S.W.2d 41, 46 (Tex. Civ. App.-Houston [14th Dist.] 1972, writ ref'd n.r.e.) (concluding that, in case in which jury followed instructions not to answer certain questions based on its answer to a prior question, party waived jury findings as to unanswered questions by not objecting to the conditional submission of those questions); *Whiteside v. Tackett,* 229 S.W.2d 908, 912 (Tex.Civ.App.-Austin 1950, writ dism'd)

(same as *Hunter*); *Bankers Standard Life Ins. Co. v. Atwood,* 205 S.W.2d 74, 77 (Tex.Civ. App.-Austin 1947, no writ) (same as *Hunter*); *Spears Dairy v. Davis,* 125 S.W.2d 382, 383 (Tex.Civ.App.-Beaumont 1939, no writ) (same as *Hunter* and stating that party is required to object to the conditioning instruction and to anticipate that jury may answer initial question in such a way that it fails to answer subsequent questions that are improperly conditioned on the jury's answer to the initial question).

49. The Insureds rely on *Spencer v. Eagle Star Insurance Co. of America;* however, *Spencer* is not on point because it did not involve a conditional submission and because an objection was made to the defect in the jury charge. *See* 876 S.W.2d 154, 157 (Tex.1994) (holding that trial court erred in rendering take-nothing judgment notwithstanding jury's verdict in favor of plaintiff based on defendant's properly preserved charge error and concluding that proper remedy was for trial court to grant new trial based on the charge error).

The Insureds argue that the two issues of the trade publication were not offered for the truth of the matters reported, but were nonetheless essential to prove the Insureds' fraud claims. According to the Insureds, the November 1992 and October 1993 issues "report[ed] on the criminal investigation of Dieter Hugel [50] and the financial instability of Ocean Marine" and were offered "to show that the Brokers were aware of those problems as early as November 1992, prior to their December 1992 Placement." The Insureds' attorney argued to the trial court, "[The publications are offered] not for the truth of the matter stated, but [for] knowledge and the relevant time period of that knowledge.... [T]his is not hearsay. It is an operative fact that was known to these people." The Insureds' attorney elaborated· that the materials were offered to "show knowledge and awareness by the agency."

The trial court excluded the two exhibits as hearsay, and explained that the Insureds seemed to be offering them for "the truth of what the article says, that on such-and-such a day, it was published and that there's something untrustworthy about this person that's in the article." The Insureds' attorney responded, "No, Your Honor. I'm saying that this would have been information that would have incited inquiry to have made inquiry [sic]

into this person, for one thing, and that that was not done." We conclude the trial court did not abuse its discretion in excluding the material.

First, there is no evidence that the Brokers read these two issues of the trade publication; thus, they are not probative of the Brokers' knowledge as the Insureds suggest.[51] Moreover, although the Insureds contend that the material was not offered for the truth of the matters asserted therein, it appears that they offered these two issues to show that the Brokers should have known of the truth of statements made in this material, and should have had such knowledge at the time these issues were published. But "[t]he hearsay rules cannot be avoided by this kind of circular reasoning." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 141–42 (Tex.2004).[52] In fact, the Insureds do not merely contend that the Brokers should have known of the matters alleged in the excluded evidence, but contend that, based on information in these issues of the trade publication, the Brokers should have concluded that Ocean Marine was financially unsound or should have conducted an independent investigation of Hugel and Ocean Marine. As in *Nissan*, the Insureds' argument for admission rests on the unsupported supposition that

**50.** Hugel testified by videotaped deposition that he was the founder of "Gulf Coast Marine," which owns all of the stock in "Ocean Marine." He further testified, "The insurance company was Ocean Marine Indemnity Company. The managing general agency was Gulf Coast Marine." Ocean Marine Indemnity Company Limited was the only insurer listed on Cover Note 92BA236, dated December 29, 1992, which provided $5 million of umbrella coverage in policy year October 1, 1992 through September 30, 1993.

**51.** Andrus testified that he saw a *Surplus Lines Reporter & Insurance News* in Novem-

ber 1992, but he did not state what issue he saw.

**52.** In *Nissan*, the trial court admitted a database of complaints Nissan received regarding unintended acceleration in one of its models. *Id.* at 140. The database did not contain evidence that the complaints catalogued were the same as the complaints asserted by the appellee. Likewise, the exhibits at issue here describe complaints against Ocean Marine and Hugel that are different from those asserted by the Insureds.

"where there's smoke, there's fire." [53] Under these circumstances, we conclude the trial court did not abuse its discretion in excluding this evidence, and we overrule the Insureds' fourth issue.

## E. Attorneys' Fees

■ The Insureds' argument in support of their fifth issue consists of two sentences. First, the Insureds contend that because the jury's liability findings must be reversed and remanded, the jury's finding regarding the attorneys' fees incurred by the Insureds must also be reversed. Second, they assert that the jury's finding regarding the Insureds' attorneys' fees is against the great weight and preponderance of the evidence. In their reply brief, the Insureds state that this finding is not essential to the judgment but instead is advisory and legally irrelevant.

Although properly submitted, the jury's finding regarding the expenses incurred by the Insureds to defend against the *Derrick* litigation, prosecute the Lexington Coverage Suit, and in the preparation, trial, and appeal of this case have been rendered immaterial by the jury's answers to other questions. *See Se. Pipe Line Co., Inc. v. Tichacek,* 997 S.W.2d 166, 172 (Tex. 1999). Moreover, our disposition of this appeal does not affect the Brokers' liability to the Insureds under any theory of liability submitted to the jury.

Under these circumstances, we are not persuaded that the finding at issue constitutes or results in reversible error. *See* Tex. R. App. P. 44.1. Accordingly, we overrule the Insureds' fifth issue.

## F. Non–Disclosure Order

■ The sixth and last issue concerns the trial court's Non–Disclosure Order granting Lexington's "Motion to Enforce Confidentiality Agreement." The Insureds argue that the trial court's order prohibiting the Insureds and their attorneys from using documents that Lexington considers confidential is an injunction that expired upon entry of final judgment, or alternatively, is void due to procedural defects. Lexington has moved to dismiss the appeal of this issue and to designate certain items in the record for *in camera* review.

The Insureds ask this court to declare that the trial court's Non–Disclosure Order was dissolved upon the trial court's rendition of final judgment and to dismiss as moot the appeal from this order because, they argue, the order is no longer in effect. We conclude, however, that the Non–Disclosure Order was void from the moment it was signed and therefore the Insureds' appeal from this order is moot.

The Insureds named Lexington as a defendant in this case. The Insureds later settled their claims against Lexington as well as the claims between the Insureds and Lexington in the Coverage Suit. To

---

**53.** The November 1992 issue reports that Louisiana "Commissioner of Insurance Jim Brown has filed suit against players associated with failed Alliance Casualty and Reinsurance Co.," alleging that the defendants—including Hugel and Ocean Marine Indemnity Co., the errors and omissions carrier for Alliance's holding company—overstated Alliance's assets, which allegedly caused Alliance to become insolvent. But this article simply repeats allegations, and even the allegations differ from those made by the Insureds. Moreover, the October 1993 issue was published nearly a year after the date on which the Insureds contend the Brokers should have been aware of Ocean Marine's financial difficulties and Hugel's admitted crime. Consequently, this issue is not probative of the Insureds' contention that the Brokers should have been aware of Hugel's criminal activity or Ocean Marine's financial difficulties before the coverage was placed in 1992.

effect this settlement, Lexington and the Insureds entered into a Rule 11 agreement and a "General, Full, and Final Release of All Claims and Indemnity Agreement" ("Settlement Agreement"). As part of this settlement, the trial court signed an order dismissing Lexington from this suit at a time when Lexington had not asserted a counterclaim or otherwise sought relief from the court. Thereafter, the Insureds amended their petition without naming Lexington as a defendant, thereby eliminating Lexington as a party in this case. From that point forward, the Insureds did not assert any claims against Lexington, and Lexington was no longer a party in this case. *See Webb v. Jorns,* 488 S.W.2d 407, 409 (Tex.1972).

Sometime later, Lexington, no longer a party in the case, filed a "Motion to Enforce Confidentiality Agreement and For Entry of Protective Order." In this motion, nonparty Lexington alleged that Varco International, Inc., the parent company of the Insureds and a nonparty to this case, had breached various agreements with Lexington, including the Settlement Agreement, by filing several documents with the Texas Supreme Court in an amicus brief. To remedy this situation, nonparty Lexington asked the trial court to enjoin nonparty Varco, as well as the Insureds and their counsel, from further use or disclosure, in this case or in any other proceeding, of any documents designated by Lexington as "Confidential Information." The trial court granted this injunctive relief in its Non–Disclosure Order, but did not refer to the order in its final judgment.

■ If a trial court still has jurisdiction over the parties and the case, and if one of the parties to a settlement agreement amends its pleadings to assert a claim based on breach of the settlement agreement, the trial court, by normal rules of pleading and proof, can enforce the settlement agreement in the same cause number as the case that was the subject of the settlement agreement. *See Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 658 (Tex.1996). However, when Lexington filed its motion to enforce, the Insureds already had nonsuited their claims against Lexington, and Lexington was no longer a party. Furthermore, the main target of Lexington's motion was Varco, which may have been a party to the Settlement Agreement but was not a party to this case. Lexington's involvement cannot fairly be deemed an intervention, nor can Lexington be deemed an intervenor. The motion Lexington filed was not a plea in intervention either in form or in substance, and the trial court did not treat it as such.

■ Because Lexington was not a party at the time the trial court signed the Non–Disclosure Order, the trial court lacked the power to grant the requested relief. The Rule 11 agreement relating to the settlement was not filed with the trial court and was not incorporated into any judgment or decree of the trial court; thus, the claims that had been settled were no longer a "suit pending" before the trial court. *See* TEX. R. CIV. P. 11 ("Unless otherwise provided in these rules, no agreement between attorneys or *parties touching any suit pending* will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." (emphasis added)).[54]

---

54. A nonparty may seek relief from a trial court regarding discovery sought from the nonparty by parties in a case pending in the trial court. *See, e.g.,* TEX. R. CIV. P. 192.6. In

fact, Lexington sought, in the alternative, a protective order under Texas Rule of Civil Procedure 192; however, Lexington did not

We conclude that the trial court's Non–Disclosure Order was void from the moment it was signed, and thus, the Insureds' appeal from that order and their sixth issue are moot. Accordingly, we dismiss the appeal of this order as moot. Given that we have dismissed the appeal on other grounds, we also dismiss as moot Lexington's motion to dismiss the Insureds' appeal from this order.

## G. Lexington's Motion to Designate Items for *In Camera* Review

 Lexington also has filed on appeal a "Motion To Designate Items for *In Camera* Review" (hereinafter "Motion to Seal"). Lexington asks this court to issue an order limiting inspection of certain documents contained in our appellate record to *in camera* review. Although Lexington never states that it seeks to seal part of this court's record, that is effectively the relief it seeks. Lexington does not allege, and our record does not reflect, that the trial court sealed these documents in the trial court's record. On its face, Texas Rule of Civil Procedure 76a, entitled "Sealing Court Records," does not give appellate courts the authority to find the necessary facts and to determine motions to seal on appeal, and the Insureds have not cited any statute, rule, or case stating that appellate courts have this authority. *See* Tex. R. Civ. P. 76a.

Presuming, without deciding, that this court has such authority, we conclude that

Lexington has waived its right to ask this court to seal the record as to these documents. The record reflects that on March 29, 2006, counsel for the Insureds filed a written request with the clerk of the trial court, asking that the filings to which these documents are attached be included in a supplemental clerk's record to be filed in this court. The written request indicates that counsel for Lexington was informed of the request by facsimile. The district clerk filed an unsealed supplemental clerk's record containing the documents in question with this court on June 21, 2006. Lexington did not ask this court to seal the record until November 10, 2006, when it filed the Motion to Seal.[55] By then, the Insureds, Lexington, and the Brokers had filed their appellate briefs, more than seven months had passed since the Insureds asked the district clerk to file these unsealed court records with this court, and these unsealed documents had been on file with this court for more than four months. There is no indication in the record that Lexington has ever filed a motion to seal the trial court's record as to these documents, and the documents continue to be available to the public from the clerk of the trial court. On this record, we conclude that Lexington waived any right it may have had to obtain an order sealing this part of the appellate record.[56]

## IV. CONCLUSION

On this record, we hold that the trial court erred in granting the Brokers' mo-

---

assert that any discovery was being sought from it in this litigation.

**55.** Lexington filed its motion to dismiss on March 7, 2006. In this motion Lexington referred to 20 exhibits that it described as "filed for the Court's *in camera* inspection or alternatively under seal." The record does not reflect that the trial court sealed its record as to these documents, and, in its motion to dismiss, Lexington did not ask this court to seal its record as to these documents.

**56.** *See In re R.D.*, 955 S.W.2d 364, 366 (Tex. App.-San Antonio 1997, pet. denied) (holding parties waived any right they had to ask that appellate record be sealed). To the extent Lexington asserts the Insureds' alleged violations of the Non–Disclosure Order as a basis for this motion, we already have concluded that this order is void.

tion for partial summary judgment because the Brokers failed to conclusively establish that the two-year statute of limitations bars the Insureds' claims for negligence, negligent supervision, negligent misrepresentation, and alleged violations of article 21.21 of the Insurance Code. On the other hand, the trial court did not err in granting the Brokers' motion for directed verdict as to the Insureds' claims for breach of fiduciary duty, and the Insureds did not preserve error as to their third issue concerning the trial court's denial of the motion for judgment notwithstanding the verdict on their Unauthorized Insurance Claims. We further hold that the trial court did not abuse its discretion by excluding from evidence two issues of a trade publication offered by the Insureds at trial, and the jury's findings regarding the Insureds' attorneys' fees do not present reversible error. Finally, we conclude that the Insureds' appeal from the Non–Disclosure Order is moot because the order is void, and Lexington waived any right it may have possessed to obtain the relief sought in its Motion to Seal.

We therefore

- reverse the trial court's judgment regarding the Insureds' claims for negligence, negligent supervision, negligent misrepresentation, and alleged violations of article 21.21 of the Insurance Code;
- affirm the trial court's directed verdict in favor of the Brokers concerning the Insureds' claims for breach of fiduciary duty;
- affirm the trial court's denial of the Insureds' motion for judgment not-

withstanding the judgment concerning the Insureds' Unauthorized Insurance Claims;

- dismiss as moot the Insureds' appeal of the trial court's Non–Disclosure Order;
- dismiss as moot Lexington's motion to dismiss;
- deny Lexington's Motion to Seal; and
- remand this case for further proceedings consistent with this opinion.

FROST, J., concurring and dissenting.

KEM THOMPSON FROST, Justice, concurring and dissenting.

I concur in several parts of the court's judgment[1] but I part ways with the majority when it comes to the analysis of the trial court's March 18, 2005 summary-judgment order ("March Order"). In its review of that order, the majority wrongly refuses to consider the evidence attached to the brokers' reply ("Reply Evidence"). The Reply Evidence was timely filed more than 21 days before the submission date for the brokers' motion for summary judgment, and this evidence conclusively proves the brokers' limitations defense. Therefore, this court should affirm, rather than reverse, the March Order.

As to the third issue, the Insureds did not preserve error as to the appellate argument they assert under this issue. Therefore, this issue should be overruled. Though the majority overrules this issue, it mischaracterizes the alleged error asserted by the Insureds under this issue.

1. The court correctly (1) affirms the trial court's directed verdict as to the Insureds' claims for breach of fiduciary duty, (2) concludes that the trial court did not err in excluding from evidence two issues of a periodical, (3) overrules the Insureds' third and fifth issues, (4) dismisses as moot the Insureds' appeal as to the trial court's April 5, 2005 order, (5) dismisses as moot Lexington's motion to dismiss the Insureds' appeal as to this order, and (6) denies Lexington's "Motion To Designate Items for *In Camera* Review."

SUMMARY JUDGMENT ON LIMITATIONS

In their first issue, the Insureds [2] challenge the March Order on the grounds that (a) in their motion for partial summary judgment based on the statute of limitations ("Motion"), the Brokers [3] did not address the 1991 and 1992 placements; (b) limitations on the claims regarding the 1993 and 1994 placements did not begin to run until the Insureds suffered a legal injury, which they claim did not occur until Lexington denied coverage or until the Insureds became liable to pay a settlement in excess of policy limits, both of which occurred within two years before this lawsuit was filed; and (c) the Brokers did not offer any summary-judgment evidence establishing that the Insureds knew or should have known of the Brokers' violations of article 21.21 of the Insurance Code more than two years before they filed suit.

### Scope of the Motion

In their first sub-issue, the Insureds argue that the Brokers asserted only one ground in the Motion—that the statute of limitations had run as to the Insureds' claims involving placement of the Lexington policies in 1993 and 1994. In the Motion, the Brokers asserted that the two-year statute of limitations bars the Insureds' claims for negligence, negligent supervision, negligent misrepresentation, and alleged violations of article 21.21 of the Insurance Code. The Brokers did not limit their summary-judgment ground to the

2. The "Insureds" means appellants Environmental Procedures, Inc. d/b/a Sweco Oilfield Services and Advanced Wirecloth, Inc.

3. The "Brokers" means appellees George E. Guidry, Dwight W. Andrus, III, and Dwight W. Andrus Insurance, Inc.

4. In their "Motion to Strike Defendants' Motions for Summary Judgment," filed on January 31, 2005, the Insureds state that the Motion was originally set for submission without oral argument on December 13, 2004, and

Insureds' claims involving placement of the Lexington policies. Therefore, the Insureds' first sub-issue lacks merit.

### The Trial Court's Re-setting of the Submission Date and Consideration of the Reply Evidence

The Insureds assert on appeal that this court cannot consider the Reply Evidence because (1) this evidence was allegedly untimely and (2) the trial court never granted the Brokers leave to file this evidence late. Although the trial court never granted leave to file the Reply Evidence late, the record reveals that no leave was necessary because the Brokers filed this evidence more than 21 days before the submission date on March 18, 2005.

The record reflects the following chronology regarding the Brokers' summary-judgment motion:

- November 10, 2004—The Brokers file the Motion.
- The Motion is set for submission on December 13, 2004.
- The Motion is re-set, to be submitted to the court without oral argument on February 7, 2005.[4]
- January 26, 2005—The Brokers file their reply with attached evidence ("Reply").
- January 31, 2005—The Insureds file a motion to strike the Reply Evidence as untimely because it was not filed 21 days before the submission date. The

then re-set for submission on February 7, 2005. Although the appellate record does not contain any notices of submission for the Motion, it does contain a notice that the Motion was set for oral argument on January 31, 2005. There is a handwritten notation on this notice indicating that the Motion will be re-set to February 7, 2005. On February 9, 2005, the parties stated at a conference that the submission date for the Motion had been re-set to February 7, 2005.

Insureds also file a motion to strike the Brokers' summary-judgment motions because they had been set for submission after the deadline in the docket control order.

- February 9, 2005—The trial court denies the Insureds' motion to strike the Brokers' summary-judgment motions.

- At some point between February 9, 2005 and March 18, 2005, the trial court re-sets the Motion for submission on March 18, without oral argument.

- March 18, 2005—During a status conference in open court, the trial judge announces that she has denied a group of motions, and this group includes the Insureds' motion to strike as untimely the Reply Evidence.[5] The trial judge further states that she had set the Motion for submission on March 18, 2005, and that counsel knew about this setting.[6] No party challenges this statement, states that the court did not re-set the submission date, expresses surprise that the trial court had set the Motion for submission on that date, or objects to any alleged lack of notice that the submission date had been re-set. The trial court also announces that it is granting the Motion. The Insureds' counsel complains that the Reply Evidence had been on file for less than ten days before the

submission date for the Motion. The trial court responds by noting that the court set the Motion for submission on March 18, which is more than 21 days after the Reply was filed.

Except on leave of court, a movant is required to file and serve summary-judgment evidence at least 21 days before the time specified for the motion to be submitted to the trial court for decision. *See* Tex.R. Civ. P. 166a(c); *Martin v. Martin, Martin & Richards, Inc.,* 989 S.W.2d 357, 359 (Tex.1998). Though the trial court did not grant the Brokers leave to file the Reply Evidence, it did not need to do so because the trial court took an action that made the evidence in question timely filed—it specified March 18 as the submission date for the Motion. *See Dalehite v. Nauta,* 79 S.W.3d 243, 245 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (holding that evidence filed less than 21 days before original summary-judgment hearing was timely, even though trial court never granted leave to file late evidence, because the summary-judgment hearing was re-set to a date more than 21 days after the evidence was filed); *Thomas v. Medical Arts Hosp. of Texarkana,* 920 S.W.2d 815, 818 (Tex.App.-Texarkana 1996, pet denied) (holding that trial court's re-setting of hearing date for motion for summary judgment made timely summary-judgment evidence that had been untimely

---

5. The trial judge stated that she had denied all pending motions that were based on the untimeliness of documents that then had been on file for more than thirty days. The Insureds' motion to strike the Reply Evidence was a motion pending on March 18 that was based on the alleged untimeliness of documents that then had been on file for more than thirty days. Therefore, the trial court denied the Insureds' motion to strike the Reply Evidence.

6. Strangely, though no party disputes that the Motion was submitted on March 18, the ma-

jority concludes that the Motion was not submitted on March 18. *See ante* at pp. 612–21. However, on that date, the trial court twice stated that, on its own motion, it had set the Motion for submission on March 18. The second statement was in response to a complaint by counsel for the Insureds that the trial court could not consider the Reply Evidence because it had not been on file for 21 days before the submission date for the Motion. This court should take the trial court at its word that it re-set the submission date for

based on hearing date in effect when the evidence was filed and served). Thus, the timeliness of the Reply Evidence was no longer an issue.

If, as in this case, the trial court exercises its discretion to re-set the submission date for a motion for summary judgment, the movants' summary-judgment evidence must be on file and served at least 21 days before the new submission date. *See Dalehite,* 79 S.W.3d at 245; *Thomas,* 920 S.W.2d at 818. Because the Brokers filed and served the Reply Evidence more than 21 days before March 18, that evidence was timely.[7] *See Dalehite,* 79 S.W.3d at 245; *Thomas,* 920 S.W.2d at 818. And because this evidence was timely, no presumption arose that the trial court did not consider the evidence. Thus, it was unnecessary for the Brokers to obtain leave of court to file the Reply Evidence late.

**The majority finds the trial court did not re-set the Motion but, in their motion for rehearing, even the Insureds agree that the trial court re-set the submission date for the Motion to March 18.**

In determining that the trial court reversibly erred in granting the Motion (and that the Insureds' motion for rehearing should be granted), the majority relies on its conclusion that the trial court did not re-set the submission date for the Motion to March 18. But, contrary to the majority's conclusion, in their Motion for Rehearing, the Insureds assert that the trial court did re-set the submission date for the Motion to March 18; however, the Insureds claim that they did not receive notice that the Motion had been re-set until March 18. The Insureds state that "giving notice on

March 18—the day summary judgment was granted—that the submission date had been re-set to March 18 made it impossible for plaintiffs to file controverting evidence." Thus, the majority's conclusion that the trial court did not re-set the submission date for the Motion to March 18 is contradicted by the Insureds themselves.

In addition, the Insureds' assertion in their motion for rehearing that they had insufficient notice of the trial court's resetting of the submission date is not a basis for granting rehearing because it is well-established that, if the trial court did not give sufficient notice in this regard, the Insureds had to raise this complaint in the trial court. *See Okonkwo v. Washington Mut. Bank,* No. 14–05–00925–CV, 2007 WL 763821, at *2 (Tex.App.-Houston [14th Dist.] Mar. 15, 2007, no pet.) (mem.op.) (holding appellant waived his complaint that trial court gave him no notice of submission date for summary-judgment motion by not raising the objection in the trial court); *Babajide v. Citibank (South Dakota), N.A.,* No. 14–04–00064–CV, 2004 WL 2933575, at *1 (Tex.App.-Houston [14th Dist.] Dec. 21, 2004, no pet.) (mem. op.) (holding appellant waived her complaint that trial court gave her no notice of summary-judgment hearing by not raising the objection in the trial court); *Rios v. Texas Bank,* 948 S.W.2d 30, 32–33 (Tex. App.-Houston [14th Dist.] 1997, no pet.) (concluding that, to preserve error, nonmovant who receives insufficient notice of summary-judgment hearing but is able to attend hearing must complain about the notice in writing before the end of the

the Motion so that it would be submitted on March 18.

7. More than thirty days after the trial court signed its final judgment, the Brokers filed a motion to modify the final judgment to include a statement that the trial court considered the Reply. This motion was untimely,

and the trial court had no plenary power to grant it. *See* Tex R.Civ.P. 329b(a), (g). Furthermore, the Brokers never set this motion for hearing or submission, and the record does not reflect that the trial court ever considered it. Therefore, the majority should not rely on the trial court's failure to grant this motion. *See ante* at pp. 618–19.

hearing but that a nonmovant who receives no notice of the hearing and is unable to attend the hearing still must preserve error in the trial court, though such a party may do so by obtaining an adverse ruling on a post-judgment motion).[8] When the trial court stated that counsel and parties knew that the court had re-set the submission date for the Motion to March 18, no party challenged this statement or expressed surprise or lack of awareness that the trial court had re-set the submission date. The Insureds did not object at the March 18 hearing to any lack of notice of the trial court's re-setting of the submission date on the Motion, and they did not voice any such complaint at any other point in the trial court. Therefore, the Insureds did not preserve error as to any alleged defect in the trial court's notice regarding the re-setting of the submission date for the Motion. See Okonkwo, 2007 WL 763821, at *2; Babajide, 2004 WL 2933575, at *1; Rios, 948 S.W.2d at 32–33.

The majority devotes nearly one-third of its lengthy opinion to outlining its reasons for concluding that the trial court did not re-set the submission date for the Motion to March 18. Though the parties dispute the propriety of the trial court's action in re-setting the Motion, no party asserts that the Motion was not re-set. The ma-

jority's reasons for reaching the opposite conclusion are not convincing.

On March 18, the trial court told counsel "you know that I have put on this morning's submission docket, on the Court's motion, the [Motion] ..." The majority concludes that the trial court could not have meant that it had re-set the submission date on the Motion to March 18 because this would conflict with the requirement of the Texas Rules of Civil Procedure that summary-judgment notices must be given in writing.[9] However, presuming that written notice is required, the failure to give notice in writing does not mean that no notice was given. To the extent the notice was not in accordance with the rules, the Insureds waived their objections to any defects by failing to complain in the trial court. See Okonkwo, 2007 WL 763821, at *2; Babajide, 2004 WL 2933575, at *1; Rios, 948 S.W.2d at 32–33. The trial court stated twice that it had re-set the Motion to March 18 and once that counsel knew that it had done so. Nonetheless, the Insureds (represented by various lawyers whose ability to object is apparent in the record) did not contradict these statements or complain that the notice was inadequate or not in writing.[10] Therefore, any written-notice requirement would not indicate that the trial court did not re-set the Motion.

8. The majority cites Int'l Ins. Co. v. Herman G. West, Inc.; however, that case deals with insufficient notice rather than preservation of error regarding complaints of insufficient notice. See 649 S.W.2d 824, 825–26 (Tex.App.-Fort Worth 1983, no writ).

9. See ante at p. 616.

10. The majority seems to indicate that no notice of the March 18 submission date had been given because there is no written notice of submission in the clerk's record. But the record does not contain a notice of submission as to the first two submission dates for the Motion (December 13, 2004, and Febru-

ary 7, 2005) either, yet it is undisputed that notice was given as to these submissions. There is no requirement that the record contain notices of submission before this court can conclude that the Motion was set for submission on March 18. The trial court stated that counsel knew that the trial court had set the Motion for submission, and no party corrected the court or objected to a lack of notice in the trial court or expressed surprise that the trial court had set the Motion for submission on that date. The record shows that the Motion had been set for submission on March 18 and that notice had been given of this submission date.

The majority asserts that there is no evidence in the record that the trial court withdrew the Motion from its submission on February 7, 2005, and that therefore the Motion's submission date was not re-set.[11] This reasoning is flawed for several reasons. The record reflects that the Motion was originally set for submission on December 13, 2004, and then re-set for submission on February 7, 2005. Nonetheless, the record contains no notice setting the Motion for submission on either date, and there is no evidence that any party or the trial court withdrew the Motion from submission on December 13, 2004. In addition, if the trial court re-sets the submission date of a motion, it necessarily withdraws the former submission date. The majority has cited no legal requirement that, in addition to re-setting the submission date on a motion, the trial court also must take separate action to withdraw a motion from submission on a certain date. The absence of an express withdrawal of the Motion from submission on February 7, 2005 does not indicate that the trial court did not re-set the Motion, especially in light of the trial court's clear and uncontroverted statement that it *did* re-set the submission date for the Motion to March 18.

The majority asserts that the trial court's statement that it had re-set the submission date conflicts with Rule 3.3.3 of the Rules of the Civil Trial Division of the Harris County District Courts.[12] HARRIS COUNTY DIST. CT. CIV. TR. DIV. R. 3.3.3. However, this local rule simply states that, as to motions to be heard by submission, the "Motions shall state Monday at 8:00 a.m. as the date for written submission." HARRIS COUNTY DIST. CT. CIV. TR. DIV. R. 3.3.3. The Motion that the Brokers filed did not state any Monday as a date for written submission. Even though the first two days on which the Brokers set the Motion for submission were Mondays, nothing in the local rule states that trial courts lack the power to re-set motions to a submission date that is not on a Monday. Indeed, the rule does not address the manner in which a trial court is to re-set the submission date for a motion.

The majority and the Insureds rely on the absence of any reference to the Reply in the trial court's March Order.[13] The trial court indicated in open court on March 18, that the Reply Evidence was timely because it was filed more than 21 days before the March 18 submission date. Nonetheless, the majority concludes that the trial court recognized that the Reply Evidence was not timely and that the trial court did not consider this evidence, a fact the majority claims is reflected by the absence of a reference to the Reply in the March 18 order.[14] However, on March 18, the Insureds' counsel specifically asked the trial court what documents it had considered before signing the March Order. The Insureds' counsel stated that the trial court had considered the Reply and the Insureds' sur-reply, and the trial court agreed. The Insureds' counsel then complained that the Reply Evidence was filed less than 21 days before the submission date for the Motion. The trial court indicated that this was not a problem given that the court had re-set the submission date to March 18. The March Order does

11. *See ante* at pp. 616, 619–21.

12. *See ante* at p. 616, n. 15.

13. *See ante* at pp. 618–19, 620–21.

14. In the motion for rehearing, the Insureds go further than the majority by asserting that,

in the March Order, the trial court recited that the summary judgment was "based *only* on the Motion and Response." (emphasis added). This is inaccurate. The order does not state that it was based "only" on these items.

not make reference to either the Reply or the sur-reply, upon which the trial court stated it was relying. This silence is not surprising because the record reflects that the proposed order (filed on November 12, 2004) that eventually would become the March Order was filed before the Reply and the sur-reply were filed, and thus the drafter of that order would not have included those yet-to-be created documents in the recital of the proposed order filed months before. Because the record reflects that the trial court did consider the Reply, the fact that the March Order makes no specific reference to the Reply is hardly significant. Though trial courts can and sometimes do affirmatively state in a summary-judgment order the evidence considered or not considered, trial courts are not required to do so.[15] In the March Order, the trial court did not specify the summary-judgment evidence upon which its ruling was based. At the March 18 hearing, the trial court stated that it had considered the Reply.[16]

The majority and the Insureds emphasize that, during the hearing on the Insureds' motion for reconsideration, the trial court stated that it was not going to consider the statute-of-limitations arguments in the Reply.[17] The majority and the Insureds suggest that this statement shows that the trial court did not consider the Reply Evidence in granting summary judgment on March 18. However, the trial court also stated that it was not convinced that it should change its prior summary-judgment ruling, and the court denied the motion for reconsideration.[18] At the hearing on this motion, the trial court made no mention of the Reply Evidence or the timeliness of this evidence. Regardless of the submission date for the Motion, the trial court could not consider the additional grounds[19] that the Brokers added in their Reply because summary-judgment grounds must be contained in the summary-judgment motion rather than in a reply or in any other document.[20] *See McConnell v. Southside In-*

15. If in the March Order, the trial court had stated that it considered the Motion, found it had merit and granted the Motion, without mentioning the Insureds' response, this court would not, on the basis of this language, conclude that the trial court had refused to consider the response.

16. The Brokers, in the Reply, sought, among other things, to assert new summary-judgment grounds not contained in the Motion. The trial court did not state that it granted summary judgment based on these new grounds. Such a ruling would have been improper because summary judgments cannot be based on grounds contained only in replies. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993).

17. *See ante* at pp. 619–20.

18. In the final judgment, the trial court states that it denied the Insureds' motion to reconsider.

19. Among the new summary-judgment grounds not contained in the Motion was the argument that the Insureds' claims were barred by a Louisiana prescription statute.

20. The majority also states that, if the submission date for the Motion had been re-set to March 18, then the Reply would have been timely filed, and the trial court could properly have considered the new summary-judgment grounds in the Reply. Because the trial court stated at the hearing on the Insureds' motion for reconsideration, that it did not consider these grounds, the majority asserts that the trial court must not have re-set the submission date to March 18. *See ante* at pp. 619–20. The majority's analysis in this regard conflicts with Texas Rule of Civil Procedure 166a(c) and with *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) and its progeny. Even with the trial court's re-setting of the submission date for the Motion to March 18, the trial court still could not grant summary judgment based on the new grounds in the Reply because summary judgments in Texas can be based only

*dep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex. 1993). At the motion-for-reconsideration hearing, the trial court did not state that it had not considered the Reply Evidence; rather, the court stated, "And by the way, even though no one really mentioned it, I'm not going to consider the statute of limitations *arguments* that were in your reply. I'm going to limit it to the matter of law that you raised in your initial motion."[21] In context, the trial court's statements indicate that, looking back over the grounds asserted in the Motion and not considering the new grounds contained in the Reply, the trial court did not wish to change its summary-judgment ruling. These statements do not address whether the trial court considered the Reply Evidence.[22]

Rather than conclude that the trial court did not re-set the submission date for the Motion to March 18, the majority should take the trial court at its word.

### *The Reply Evidence*

The Insureds did not controvert the timely Reply Evidence, which showed, among other things, the following:

- On July 20, 1993, the Insureds submitted to the Andrus Defendants a listing of attorneys' fees for which they were seeking reimbursement under the comprehensive general liability ("CGL") policies brokered by British American. The Insureds were seeking reimbursement of attorneys' fees incurred in connection with the Derrick claim.
- On or about July 15, 1994, Derrick filed a patent infringement suit arising out of the 421 patent against Wirecloth. The suit involves patent and trademark infringement activities by Wirecloth which allegedly began in 1993.
- The Andrus Defendants submitted a bid for the renewal of the Insureds' coverage for the 1994–1995 period. The Insureds accepted the bid which included another written proposal submitted by the Agency. That proposal stated that defense costs were within limits.
- On or about October 5, 1994, the law firm of Maginnis & Picou, on behalf of the London Underwriters for the primary CGL coverage for the 1992–1993

on grounds stated in motions. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993).

**21.** Emphasis added.

**22.** At one point in their appellate brief, the Brokers assert that the trial court stated it had not considered the evidence attached to the Reply. The Brokers do not affirmatively state that the trial court did not consider the Reply Evidence. The Brokers' statement is not so unequivocal as to constitute a judicial admission. The Brokers argue in their brief that the Insureds' claims are time-barred, that the Reply Evidence was timely, and that the trial court noted, on the day it granted the Motion, that the Reply Evidence was timely because it was filed more than 21 days before the March 18 submission date. One inaccurate statement made in passing in the argu-

ment section of the Brokers' appellate brief should not change the analysis. A judicial admission must be clear, deliberate, and unequivocal. *See Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex.1996). The Brokers do not clearly, deliberately, and unequivocally admit that the trial court stated that it did not consider the Reply Evidence, and they certainly do not admit that the trial court did not consider the Reply Evidence. *See OAIC Comm. Assets, L.L.C. v. Stonegate Village, L.P.,* 234 S.W.3d 726, 742–43 (Tex.App.-Dallas 2007, pet. filed) (holding that appellate briefing did not contain unequivocal and deliberate admission in light of all the arguments and *statements* made in the briefing). In their response to the Insureds' motion for rehearing, the Brokers confirm that this statement in the brief was an inadvertent error and not a judicial admission.

policy, wrote a letter to Wirecloth, stating that the underwriters were investigating the 1994 Derrick lawsuit to determine if they had any duty to defend and indemnify as to this lawsuit. The underwriters stated that they would not pay any amount of costs or attorneys' fees until they determined their obligation, if any, to indemnify Wirecloth regarding this matter.

- On or about August 11, 1995, Robert Holman of Technical Risks, Inc. conducted an insurance review for the Insureds. In reviewing the existing CGL coverage, he noted: "The second area of concern is that defense costs are part of the limit. Not only does this reduce your 'per occurrence' limit; it also reduces your aggregate."

- On or about November 13, 1995, Cynthia Fountain of Lexington Insurance Company wrote the Insureds advising that Lexington denied coverage and would not defend or indemnify the Insureds regarding Derrick's 1995 lawsuit against the Insureds.

- On or about February 27, 1996, the Insureds forwarded to Guidry a summary of invoices for attorneys' fees broken down by claims. Guidry forwarded the summary to the various insurers. The Insureds had forwarded invoices for Derrick defense costs and attorneys' fees to the insurers in September of 1995, seeking reimbursement for the Insureds' payment of these invoices. However, no payment was forthcoming as of the end of February 1996.

- On or about March 8, 1996, attorney Steve Borgman of Vinson & Elkins sent the Insureds an insurance coverage analysis he had prepared. The Insureds invoked privilege and refused to produce this document in discovery.

- On or about March 12, 1996, Borgman (Vinson & Elkins) wrote to Fountain (Lexington) regarding a potential $6 million settlement of the two Derrick lawsuits that could occur between the Insureds and Derrick. Borgman also noted that to this point Lexington had denied coverage and had refused to provide a defense. Borgman argued that Derrick's claims were covered by the Lexington policies. In their petition, the Insureds allege that the failure to settle the case at this point was proximately caused by the Brokers' tortious conduct.

- On or about April 29, 1996, Lexington wrote the Insureds stating that Lexington would now provide defense counsel for the Insureds in the consolidated Derrick lawsuits under a complete reservation of rights.

- On March 11, 1997, Anglo American Insurance Company went into a Scheme of Arrangement (the English equivalent of bankruptcy). Anglo American was responsible for 75% of the $100,000 primary CGL insurance for the 1992–1993 policy period.

- On or about March 17, 1997, Lexington issued another reservation-of-rights letter.

- On or about May 28, 1998, James Cornell, an attorney with Haynes & Boone who was representing the Insureds, wrote to Fountain (Lexington). Cornell stated that Lexington's reservation of rights created a conflict of interest and entitled the Insureds to select their own defense counsel. Cornell stated that the Insureds have continued to pay Vinson & Elkins to defend them in the Derrick litigation, and that the Insureds were seeking reimbursement for their legal expenses in defending against Derrick's claims.

- On June 12, 1998, an attorney for some of the underwriters advised Cornell (Haynes & Boone) of Anglo American's Scheme of Arrangement (bankruptcy proceeding) in England. As of June 12, 1998, the London Underwriters for the primary CGL coverage for the 1992–1993 policy still had not stated their position in writing to Cornell regarding their defense and indemnity obligations.

- On May 12, 1999, Chester Makowski, an attorney with Royston Rayzor, Vickery & Williams wrote to Cornell (Haynes & Boone) and advised that Lexington would pay only two-thirds of defense costs based on the time of the risk and tendered a check for $181,079.12. Cornell was reminded that defense costs reduced the limits under the primary policies issued by Lexington. As of May 1999, a substantial amount of attorneys' fees and expenses had not been paid.

- On August 23, 1999, Lexington, through Fountain, issued another reservation-of-rights letter to the Insureds, noting that defense costs reduced the applicable limits of insurance under both Lexington primary CGL policies.

- In the Insureds' answer in the Coverage Suit, they stated that they had incurred more than $17 million in attorneys' fees and expenses defending the Derrick litigation and that through November 19, 2001, Lexington had reimbursed the Insureds less than $330,000, in payments made in 1999. The Insureds stated that the underwriters on the 1991 and 1992 policies had reimbursed the Insureds less than $365,000 of the more than $17 million in attorneys' fees and expenses.

*Limitations as a Bar to the Insureds' Claims: The Insureds suffered a legal injury more than two years before they filed suit.*

In their second sub-issue, the Insureds assert that limitations on the claims regarding the 1993 and 1994 placements did not begin to run until the Insureds suffered a legal injury, which the Insureds assert did not occur until Lexington denied coverage or until the Insureds became liable to pay a settlement in excess of policy limits.

The Insureds alleged, in part, that the Brokers engaged in the following "tortious conduct":

- failing to promptly notify insurers of Derrick's claim in the early summer of 1994;
- placing coverage with financially unsound insurers and insurers whose management was unsound;
- placing coverage with non-existent insurers, insurers who had ceased doing business, or insurers who were corrupt and engaged in criminal misconduct;
- failing to disclose to the Insureds the Brokers' knowledge of the insolvency and corruption of the insurers with whom the coverage had been placed;
- selling insurance to Texans without a Texas license;
- selling surplus-lines insurance without a surplus-lines license and without compliance with the surplus-lines laws;
- failing to understand the defects in the insuring contracts and insuring entities, or, alternatively, knowing of the defects, and selling the policies without disclosure;
- negligently failing to secure better, available insurance;
- falsely representing that "Sovereign" had insured the Insureds when it had not;

- falsely representing that they were obtaining the best possible insurance at the lowest possible price, when in fact they were not; and
- falsely representing terms and conditions of insurance and failing to disclose material terms of the insurance prior to binding the insurance.[23]

The statute of limitations does not begin to run until a claim accrues. *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996). Generally, a claim accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *Id.; Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990) (stating that "a cause of action can generally be said to accrue when the wrongful act effects an injury"). When a claim accrues is a question of law for the court. *Loyd v. ECO Resources, Inc.*, 956 S.W.2d 110, 126 (Tex. App.-Houston [14th Dist.] 1997, no pet.).

The Insureds argue that this court's precedent in *Mauskar v. Hardgrove* does not apply to this case. *See* No. 14–02–00756–CV, 2003 WL 21403464, at *2–3 (Tex.App.-Houston [14th Dist.] June 19, 2003, no pet.) (mem.op.) (holding claims for negligent procurement of insurance accrued on date the insured purchased the insurance policies). At a minimum, *Mauskar* applies to the Insureds' claims for negligence and negligent misrepresentation regarding the terms and conditions of the insurance policies, including the term under which defense costs would reduce the applicable limits of insurance as to the 1993 and 1994 policies. *See Mauskar*, 2003 WL 21403464, at *2–3. Therefore,

the summary-judgment evidence conclusively proved these claims were time-barred by the two-year statute of limitations when the Insureds filed suit in 2003.

As to the other claims regarding the 1993 and 1994 placements, the Insureds argue in their second sub-issue that the claims did not accrue until the Insureds suffered a legal injury, which they claim did not occur until Lexington filed its declaratory-judgment action against the Insureds or until the Insureds settled the Derrick suit. In support of this contention, the Insureds cite a case decided by the First Court of Appeals. *See All–Tex Roofing, Inc. v. Greenwood Ins. Group, Inc.*, 73 S.W.3d 412, 414–17 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). However, in that case there was no allegation that the insured was damaged by a failure to provide a defense or to pay defense costs. *See id.* The insured only alleged damage based on a failure to indemnify against a judgment. *See id.* In this case, the Brokers submitted undisputed summary-judgment evidence conclusively proving that on or about November 13, 1995, Lexington denied coverage, both as to defense and indemnity. More than five months later, on or about April 29, 1996, Lexington wrote the Insureds stating that Lexington would provide defense counsel for the Insureds in the consolidated Derrick lawsuits under a complete reservation of rights. However, even after April 29, 1996, the Insureds continued to pay their retained defense counsel, and they did not accept the services of the counsel that Lexington offered to provide at Lexington's expense. Under the Insureds' allegations and the uncontroverted

---

**23.** The Insureds also assert that (1) as for the "middle note" sold in October 1992, the Brokers falsely represented the identity of certain insurers and represented that certain insurers were bound when they were not and that (2) the Brokers failed to disclose that the notes

sold through British American were not protected by the guaranty funds of either Louisiana or Texas. However, these allegations do not apply to the 1993 and 1994 placements that are the subject of this sub-issue.

summary-judgment evidence, the Insureds paid their own defense counsel millions of dollars in attorneys' fees prior to August 29, 2001, two years before the date on which the Insureds filed this suit. Despite the Insureds' requests for reimbursement, Lexington reimbursed the Insureds less than $330,000 of their defense costs, and did not make any reimbursement payments until 1999.

Because Lexington denied coverage and the Insureds allegedly incurred millions of dollars in damages, sufficient facts existed for the Insureds to seek a judicial remedy based on their claims for negligence and negligent-misrepresentation and their claims for violations of article 21.21 of the Texas Insurance Code. *See Abe's Colony Club, Inc. v. C & W Underwriters, Inc.,* 852 S.W.2d 86, 90–91 (Tex.App.-Fort Worth 1993, writ denied) (holding that cases in which only issue was liability above the policy limits were not on point in case in which insured sought damages for expenses it incurred in defending third-party claims, and that such damages constitute legal injury resulting in accrual of claim and starting of limitations). Therefore, the Insureds' second sub-issue lacks merit.

### The evidence conclusively proves that the statute of limitations bars the Texas Insurance Code claims.

In their third sub-issue, the Insureds assert that the summary-judgment evidence does not conclusively prove that the statute of limitations bars their claims for violations of the Insurance Code. The Insureds allege that the Brokers violated subsections (2), (5), and (11) of section 4 of former article 21.21 of the Texas Insurance Code. In summary, the Insureds allege that they sustained actual damages caused by the Brokers' alleged (a) untrue, deceptive, or misleading statements with respect to the business of insurance or with re-

spect to any person in the conduct of his insurance business, (b) false statements of financial condition of an insurer made with intent to deceive, and (c) misrepresentation regarding insurance policies. The following is a summary of the Insureds' allegations regarding this conduct:

- The Brokers falsely represented their competence and efforts.
- The Brokers concealed the true state of affairs about Lexington, British American, and other underwriters to continue getting the Insureds' business and avoid getting sued.
- The Brokers failed to disclose to the Insureds the Brokers' knowledge of the insolvency and corruption of the insurers with whom the coverage had been placed.
- The Brokers failed to understand the defects in the insuring contracts and insuring entities, or, alternatively, knew of the defects, and sold the policies without disclosure.
- The Brokers falsely represented that "Sovereign" had insured the Insureds when it had not.
- The Brokers falsely represented that they were obtaining the best possible insurance at the lowest possible price, when, in fact, they were not.
- The Brokers falsely represented terms and conditions of insurance and failed to disclose material terms of the insurance prior to binding the insurance.
- As regards the "middle note" sold in October 1992, the Brokers falsely represented the identity of certain insurers and represented that certain insurers were bound when they were not.
- The Brokers failed to disclose that the notes sold through British American were not protected by the guaranty funds of either Louisiana or Texas.

Suit on such claims must be commenced "within two years after the date on which the ... unfair or deceptive act or practice occurred or within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discovered the occurrence of the ... unfair or deceptive act or practice." TEX. INS.CODE ANN. art. 21.21, § 16(d). The evidence shows that the Insureds were defendants in major patent and trademark litigation in federal court starting in 1994. As of August 29, 2001, the Insureds had been involved in this litigation for more than seven years. Despite the Insureds' payment of insurance premiums on various policies for the 1991 to 1994 period, their insurers had not provided them with a defense in the litigation, had not admitted that the policies provided any coverage, and had reimbursed the Insureds for only a small percentage of the millions of dollars that the Insureds had spent in defense costs. The Insureds had received an insurance review report from Technical Risks, Inc. discussing various weaknesses in their insurance coverages, including the policy feature under which the defense costs reduced the applicable limits of insurance. The Insureds also had received an insurance coverage analysis from Vinson & Elkins. Additionally, the Insureds had been advised that Anglo American was in the English equivalent of bankruptcy. The summary-judgment evidence conclusively proves that the Brokers' acts and practices alleged to be unfair or deceptive occurred before August 29, 2001, and that the Insureds, in the exercise of reasonable diligence, should have discovered the occurrence of the alleged unfair or deceptive acts or practices more than two years before the date on which the Insureds filed this suit. *See Mauskar*, 2003 WL 21403464, at *4 (af-firming summary judgment dismissing article 21.21 claims against agent relating to procurement of insurance policies based on statute of limitations and holding that plaintiff should have discovered that the terms of the policies were not as stated by the agent by reading the policies or descriptions of the policies). Therefore, the Insureds' third sub-issue lacks merit.

Because all of the sub-issues lack merit, this court should overrule the Insureds' first issue and affirm the trial court's March Order.

## UNAUTHORIZED INSURANCE ACT CLAIMS

In their third issue, the Insureds contend that the trial court erred by failing to render judgment in the Insureds' favor on their claims under section 101.201 of the Texas Insurance Code ("Unauthorized Insurance Claims") because the evidence conclusively establishes that the only exception to liability invoked by the Brokers did not apply. Contrary to the majority's characterization of the third issue, the Insureds do not argue that the trial court erred by denying the Brokers' motion for judgment notwithstanding the verdict.[24]

The trial court charged the jury on the Insureds' Unauthorized Insurance Claims. Question 9 of the court's charge was the first question concerning these claims. In it, the jury was asked whether policies from British–American Insurance Group Ltd. were independently procured, which is an affirmative defense that the Brokers asserted. Because of instructions contained in questions 10, 11, and 12, the jury would not answer any liability or damages questions regarding the Unauthorized Insurance Act ("Act") unless the jury found in question 9 that one of the policies was not independently procured. The Insureds objected at the charge conference

---

**24.** *See ante* at p. 628.

that there was no evidence to support the submission of question 9. The Insureds did not object to the instructions in questions 10, 11, and 12 that would result in the jury not answering the liability and damages questions if they found that both policies were independently procured.[25]

In answer to question 9, the jury found that both policies were independently procured. The jury obeyed the instructions in questions 10, 11, and 12 and did not answer the liability and damages questions regarding the Unauthorized Insurance Claims. The Insureds filed a motion for judgment notwithstanding the verdict and brief in support thereof ("JNOV motion"). In their JNOV motion, the Insureds asserted that the trial court should disregard the jury's answer to question 9 because there is no evidence to support it. The Insureds further asserted that the evidence at trial conclusively established liability and damages for the Unauthorized Insurance Claims, so that the trial court should render judgment on these claims without the need for any jury findings. The trial court denied the Insureds' JNOV motion.

Under their third appellate issue, the Insureds assert the trial court erred by not rendering judgment in favor of the Insureds on the Unauthorized Insurance Claims, and the Insureds assert this court should render judgment that the Brokers are liable under these claims and remand for a new trial on damages under the Act. There are several problems with the Insureds' argument.

First, the Insureds never asked the trial court to render judgment that the Brokers are liable on the Unauthorized Insurance Claims and to order a new trial as to the damages under these claims. Therefore, the Insureds did not preserve error as to their third issue. See TEX.R.APP. P. 33.1(a); *Weinberger v. Longer*, 222 S.W.3d 557, 567 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that appellant failed to preserve error because it did not present appellate complaint to trial court).

Second, even if the Insureds were asserting on appeal that the trial court erred in denying their JNOV motion, the Insureds have not briefed this argument.[26] Presuming for the sake of argument that the Insureds are correct that the evidence is legally insufficient to support the jury's answer to question 9, this would only indicate that question 9 should be disregarded; it would not provide a basis for judgment as a matter of law or for a new trial on the Unauthorized Insurance Claims. In accordance with this reality, the Insureds argued in their JNOV motion that the trial court should render judgment in their favor on the Unauthorized Insurance Claims in the amount of $10,875,000 plus attorney's fees because the trial evidence conclusively proved that the Brokers were liable for these damages under the Unauthorized Insurance Claims, obviating the need for jury findings. However, on appeal, the Insureds have provided no argument, citations to the record or to authorities, and no analysis showing that the trial evidence conclusively proves as a matter of law that the Brokers are liable under the Act and that this evidence conclusively proves the amount of the Insureds' damages under the Unauthorized Insurance Claims. Therefore, even if the Insureds had challenged the trial court's denial of the JNOV motion, they waived this issue by failing to brief it.[27] See TEX.R.APP. P.

---

**25.** In fact, the Insureds did not voice any objections to questions 10, 11, and 12 at all.

**26.** The majority claims that this is what the Insureds assert in their third issue.

**27.** Even if the Insureds had briefed this argument, the record reflects that the trial evi-

38.1(h); *Halim v. Ramchandani*, 203 S.W.3d 482, 487 n. 7 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

Third, for the Insureds to be entitled to a new trial based on the jury's failure to answer the questions 10–12 because the jury followed the instructions in these questions, the Insureds would have to have objected to the instructions in questions 10–12 that caused the jury not to answer these questions. *See Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 989–90 (1949) (holding that party that failed to object to instruction that jury not answer a question based on its answer to the prior question waived that party's right to have the jury make findings as to the subsequent question), *modified on other grounds by Bradford v. Arhelger*, 161 Tex. 427, 340 S.W.2d 772 (1960); *Texas Employers' Ins. Ass'n v. Ray*, 68 S.W.2d 290, 295 (Tex.Civ.App.-Fort Worth 1933, writ ref'd) (holding appellant could not complain of jury's failure to answer question because the charge instructed the jury not to do so based on its answer to a prior question and because appellant did not object to this instruction); *Underwriters at Lloyds v. Edmond, Deaton & Stephens Insurance Agency*, No. 14-07-00352-CV, 2008 WL 5441225, at *8 (Tex.App.-Houston [14th Dist.] Dec. 30, 2008, no pet. h.) (holding appellant could not obtain a new trial so that jury could answer liability question because the charge instructed the jury not to answer the question based on its answer to a prior question and because appellant did not object to this instruction); *Hunter v. Carter*, 476 S.W.2d 41, 46 (Tex.Civ.App.-Houston [14th Dist.] 1972, writ ref'd n.r.e.) (concluding that, in case in which jury followed instructions not to answer certain questions based on its answer to a prior question, party waived jury findings as to unanswered questions by not objecting to the conditional submission of those questions); *Spears Dairy v. Davis*, 125 S.W.2d 382, 383 (Tex.Civ.App.-Beaumont 1939, no writ) (same as *Hunter* and stating that party is required to object to the conditioning instruction and to anticipate that jury may answer initial question in such a way that it fails to answer subsequent questions that are improperly conditioned on the jury's answer to the initial question). Having failed to object to these instructions, the Insureds have waived their right to a new trial to allow the jury to answer the unanswered questions that were conditioned on the jury not finding independent procurement in question 9.

In their motion for rehearing, the Insureds rely on *BML Stage Lighting, Inc. v. Mayflower Transit, Inc. See* 66 S.W.3d 304 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). However, *BML Stage Lighting* is not on point because in that case the conditioned jury question was (1) for a completely separate claim from the prior question and (2) answering the second question would have been inconsistent with the prior question. *See id.* at 305–06. In the case at hand, the first question was an affirmative defense for the Unauthorized Insurance Claims, and such a defense, by definition, presumes that there is liability and damages on these claims. Therefore, answering the subsequent questions regarding liability and damages on the Unauthorized Insurance Claims would not have been inconsistent with the jury's finding that the Brokers proved the affirmative defense. In addition, the *BML Stage Lighting* court distinguished binding authority from the Texas Supreme Court by

dence did not prove liability and damages as to the Unauthorized Insurance Claims as a matter of law. Therefore, the trial court did not err in denying the JNOV motion.

concluding that this authority applied to conditioning jury questions regarding the same claim whereas *BML Stage Lighting* involved conditioning between two different claims. *See id.* The case at hand involves conditioning within questions regarding the same claim; therefore, *BML Stage Lighting* is not on point.

For these reasons, there is no merit in the Insureds' third issue.

### CONCLUSION

For the reasons stated above, this court should affirm the March Order in its entirety. To the extent the court reverses the March Order, I respectfully dissent.[28]

---

28. In addition, even if the majority's disposition of the issues were completely correct, the court should (1) dismiss as moot the Insureds' appeal as to the trial court's April 5, 2005 order, (2) dismiss as moot Lexington's motion to dismiss the Insureds' appeal as to this order, (3) deny Lexington's "Motion To Designate Items for *In Camera* Review," (4) reverse the judgment as to the Insureds' claims for negligence, negligent supervision, and alleged violations of article 21.21 of the Insurance Code, (5) sever and remand these claims for further proceedings consistent with the court's opinion, and (6) affirm the remainder of the trial court's judgment.